**Slip-Op. 02-27**

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: HONORABLE GREGORY W. CARMAN, CHIEF JUDGE

| | | |
|---|---|---|
| ALLOY PIPING PRODUCTS, INC., FLOWLINE DIVISION., MARKOVITZ ENTERPRISES, INC., GERLIN, INC., and TAYLOR GORGE STAINLESS, INC. | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | **Consol. Court No. 01-00099** |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| KANZEN TETSU SDN. BHD., SCHULZ (MFG) SDN. BHD., and SCHULZ U.S.A., INC., | : | |
| | : | |
| Defendant-Intervenors. | : | |

[Defendant-Intervenors' renewed motion to supplement the administrative record is denied. Plaintiffs' and Defendant-Intervenors' respective motions for judgment upon the agency record are denied. The Department of Commerce's *Final Determination* is sustained. Defendant-Intervenors' application for oral argument is denied.]

Date: March 11, 2002

*Collier Shannon Scott, PLLC* (*Jeffrey S. Beckington* and *Mary T. Staley*), Washington, D.C., for Plaintiffs.

*Robert D. McCallum, Jr.*, Assistant Attorney General of the United States; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Velta A. Melnbrencis*, Assistant Director, Commercial Litigation Branch, Civil Division,

United States Department of Justice; *Richard P. Schroeder*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Robert E. Nielsen*, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Counsel, for Defendant.

*White & Case, LLP* (*Walter J. Spak, Robert G. Gosselink*, and *Frank H. Morgan*), Washington, D.C., for Defendant-Intervenors.

OPINION

CARMAN, CHIEF JUDGE: This consolidated action comes before the Court on Plaintiffs' and Defendant-Intervenors' respective motions for judgment upon the agency record pursuant to USCIT R. 56.2. At issue are several elements of the Department of Commerce's ("Commerce") final affirmative antidumping duty ("AD") determination in *Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Butt-Weld Pipe Fittings From Malaysia*, 65 Fed. Reg. 81,825 (Dec. 27, 2000) ("*Final Determination*").

Plaintiffs Alloy Piping Products, Inc., Flowline Division., Markovitz Enterprises, Inc., Gerlin, Inc., and Taylor Gorge Stainless, Inc. ("Alloy" or "Domestic Industry") contest Commerce's use of third country sales as the basis for normal value ("NV"). Defendant-Intervenors Kanzen Tetsu Sdn. Bhd., Schulz (Mfg) Sdn. Bhd., and Schulz U.S.A., Inc. ("Kanzen") claim the *Final Determination* is subject to a ministerial error that Commerce has failed to correct. Kanzen also renews its motion, pursuant to USCIT Rules 7(f) and 71(a), for an order requiring Commerce to supplement the administrative record. Defendant, United States, opposes all three motions. On the basis of the papers submitted, the relevant statutes and regulations, and for the reasons set forth herein, the Court denies Alloy's motion for judgment upon the agency record. The Court also denies Kanzen's motion to supplement the administrative record and its motion for judgment upon the agency record. Commerce's *Final*

*Determination* is sustained.  Kanzen's application for oral argument is denied.  The Court has

jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (1994).


## BACKGROUND

On January 18, 2000, Commerce initiated an AD investigation into whether stainless

steel butt-weld pipe fittings from Malaysia were being sold, or were likely to be sold in the

United States at less than fair value.[1]  *See Initiation of Antidumping Duty Investigation: Stainless*

*Steel Butt-Weld Pipe Fittings from Germany, Italy, Malaysia and the Philippines*, 65 Fed. Reg.

4,595 (Jan. 31, 2000).  On February 10, 2000, Kanzen submitted a questionnaire response,

alleging that its Malaysian home market sales were not "viable" for purposes of calculating

normal value because their volume was less than five percent of the volume of Kanzen's U.S.

sales.  (Alloy Confidential Appendix (Alloy Conf. App.) Tab 3.)  Kanzen, therefore, submitted

third country market information to serve as the basis for NV.  (Id.)  On February 24, 2000, the

ITC published its preliminary determination that there was a reasonable indication that an

industry in the United States was being materially injured by reason of imports of the subject

merchandise from Malaysia.  *See Certain Stainless Steel Butt-Weld Pipe Fittings From*

*Germany, Italy, Malaysia, and the Philippines*, Investigations Nos. 731-TA-864-867

(Preliminary), 65 Fed. Reg. 9,298 (Feb. 24, 2000).

On August 2, 2000, after reviewing the questionnaire responses submitted by Kanzen,

---

[1] Commerce determined that it would not be practicable to investigate all four Malaysian
producers/exporters listed in the AD Petition and therefore limited its investigation to the largest producer/exporter,
Kanzen Tetsu Sdn. Bhd., pursuant to 19 U.S.C. § 1677f-1(c)(2).  *See Notice of Preliminary Determination of Sales*
*at Not Less Than Fair Value and Postponement of Final Determination:  Stainless Steel Butt-Weld Pipe Fittings*

Commerce published its preliminary determination. *See Notice of Preliminary Determination of Sales at Not Less Than Fair Value and Postponement of Final Determination: Stainless Steel Butt-Weld Pipe Fittings from Malaysia*, 65 Fed. Reg. 47,398 (Aug. 2, 2000) ("*Preliminary Determination*"). Commerce estimated a *de minimis* weighted-average dumping margin of 0.59 percent and thus preliminarily determined that stainless steel butt-weld pipe fittings from Malaysia were not being sold, nor were they likely to be sold, in the United States at less than fair value. *Id*. Important to the instant review, Commerce determined that Kanzen's "aggregate volume of home market sales of the foreign like product was less than five percent of its aggregate volume of U.S. sales for the subject merchandise, . . . [and thus] not viable." *Id*. at 47,399. Therefore, Commerce based NV on Kanzen's sales to the United Kingdom because Kanzen's aggregate volume of sales of the foreign like product in the U.K. was more than five percent of its aggregate volume of U.S. sales of the subject merchandise and therefore viable. *See id.*

Commerce then conducted a sales verification of Kanzen between September 25 and September 29, 2000. *See Sales Verification Report for the Anti-Dumping Duty Investigation Covering Stainless Steel Butt-Weld Pipe Fittings from Malaysia for the period October 1, 1998 through September 30, 1999* (Oct. 11, 2000) ("*Sales Verification Report*"), *reproduced at* Kanzen's Conf. App. Tab 3. During its verification, Commerce conducted full quantity and value reconciliation of Kanzen's U.K., U.S., and home market sales. *See* December 15, 2000 Issues and Decision Memorandum ("Decision Memo") from Joseph A. Spetrini, Deputy Assistant Secretary, Import Administration, to Troy H. Cribb, Assistant Secretary for Import

---

*from Malaysia*, 65 Fed. Reg. 47,398, 47,399 (Aug. 2, 2000) ("*Preliminary Determination*").

Administration at Comment 2, *reproduced at* U.S. App. at 7. Commerce found nothing to contradict Kanzen's assertion that its Malaysian home market was not viable for purposes of determining NV but that its third country sales to the United Kingdom did constitute a viable market for such purposes. *Id*.

In its comments on the *Preliminary Determination* Alloy objected to Commerce's reliance on Kanzen's third country sales to the United Kingdom as the basis for NV. (Petitioners' Case Brief at 3, *reproduced at* Alloy Conf. App. Tab 6.) Kanzen countered that the U.K. market was a proper, viable market for calculating NV. Decision Memo at Comment 2. After Commerce held a public hearing on November 22, 2000, it addressed all issues raised by the parties in its Decision Memo. *See Final Determination*, 65 Fed. Reg. at 81,826. There, Commerce agreed with Kanzen that the U.K. market was viable and proper to use as the comparison market. *Id.*

Commerce expressly adopted its resolution of the issues raised in its Decision Memo when it published its affirmative final determination of sales at less than fair value on December 27, 2000. *See Final Determination*, 65 Fed. Reg. at 81,826. Commerce calculated a final weighted-average dumping margin of 7.51 percent for all Malaysian producers/exporters. *See id.* at 81,827.

On December 28, 2000 Kanzen filed its first request with Commerce for correction of certain alleged ministerial errors that Commerce denied because it claimed the alleged errors did not fall within the definition of ministerial errors as provided for in the applicable statute and

regulation.[2] Kanzen filed a second request for correction of alleged ministerial errors on February 1, 2001, which Commerce again rejected, this time because it was untimely filed factual information.

On July 6, 2001 Kanzen made a motion before the Court to supplement the administrative record. Kanzen sought to include the submissions made by all parties related to its request for correction of ministerial errors. Both the United States and Alloy opposed this motion on July 20, 2001. On August 15, 2001 the Court denied Kanzen's motion with leave to renew at the time of filing its motion for judgment upon the agency record.

## STANDARD OF REVIEW

This Court will sustain a final determination by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). The substantial evidence standard applies to Commerce's factual findings. This standard requires more than a "mere scintilla" of evidence, *Primary Steel, Inc. v. United States*, 834 F. Supp. 1374, 1380 (Ct. Int'l Trade 1993), and consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Under this standard, the Court will not disturb an agency determination if its factual findings are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusion. *See Heveafil Sdn. Bhd. & Filati Lastex Sdn. Bhd. v. United States*, No. 98-04-00908, 2001 WL 194986, at *2

---

[2] The nature of the ministerial errors will be discussed in more detail in the Court's discussion of Kanzen's renewed

(Ct. Int'l Trade Feb. 27, 2001) (citing *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1563 (Fed. Cir. 1984)).

"Otherwise in accordance with law" governs Commerce's legal interpretations of the statutes it administers. To determine whether Commerce's legal interpretation and application of the antidumping statutes are in accordance with law, the Court applies the two-step test set forth by the Supreme Court in *Chevron U.S.A., Inc. v. Natural Resource Defense Counsel, Inc.*, 467 U.S. 837, 842 (1984). Under this test, the Court examines whether the relevant statute addresses the specific question at issue, and if not, whether the agency's statutory interpretation is reasonable in light of the overall statutory scheme. *See id*. at 842-43.

### DISCUSSION

There are three questions presented in this case. The first, posed by Alloy's 56.2 Motion, is whether Commerce's determination to rely on Kanzen's third country sales to the United Kingdom as the basis for NV is supported by substantial evidence on the record and is otherwise in accordance with law. The second, posed by Kanzen's 56.2 Motion, is whether Commerce's decision not to correct certain alleged ministerial errors is supported by substantial evidence on the record and is otherwise in accordance with law. The third, posed by Kanzen's renewed motion, is whether there is any basis upon which to supplement the administrative record in this case.

---

motion to supplement the administrative record and motion for judgment upon the agency record.

**I. Alloy's Motion for Judgment Upon the Agency Record**

A. Contentions of the Parties:

    *1. Plaintiffs/Alloy*

Alloy contends Commerce's decision to rely upon Kanzen's third country sales as the basis for NV is not supported by substantial evidence on the record and is not otherwise in accordance with law. (Memorandum in Support of 56.2 Motion for Judgment Upon the Agency Record Submitted by Plaintiffs Alloy Piping Products, Inc., et al. ("Alloy 56.2 Br.") at 1.)  Alloy makes two primary arguments in support of this contention: (1) Commerce erred in relying upon Kanzen's third country sales to the United Kingdom as the basis for NV because those prices were not "representative" as required by 19 U.S.C. § 1677b(a)(1)(B)(ii)(I); and (2) Commerce should have used its discretion to use home market sales as the basis for NV even though Kanzen's home market sales fell below the five percent viability threshold required by 19 U.S.C. § 1677b(a)(1)(C). (Id. at 10-13.)

Alloy notes, at the outset, that the term "representative" is not defined in the statute, corresponding regulation, legislative history, or case law.  (Id.)  Therefore, Alloy proposes that the Court apply, by analogy, the methodology used in Commerce's decision underlying *Thai Pineapple Pub. Co. v. United States*, 946 F. Supp. 11, 16 (Ct. Int'l Trade 1996).  In *Thai Pineapple*, Commerce considered eight factors to determine whether third country sales were made in the ordinary course of trade:  customers, terms of sale, volume of sales, frequency of sales, sales quantity, sales price, profitability, and market demand.  Alloy believes these eight factors could be applied to determine if Kanzen's third country sales were "representative" within the meaning of the statute.  (Id. at 17-18.)

Alloy bases its conclusion that Kanzen's third country sales are not representative on four factors. First, Alloy contends Kanzen's sales to the U.K were not representative because they were made at dumped prices. (Id. at 19.) Alloy argues Commerce must avoid using prices that it has "reason to believe or suspect" are being dumped. (Id. at 18-19.) Alloy asserts that Commerce did not, but should have, conducted a comparative analysis of sales price between third country and home market, as Commerce did in *Thai Pineapple*. (Id. at 22.) This analysis would have demonstrated to Commerce that there was a significant disparity between the respective sales prices. (Id at 23.) Alloy asserts reliance on dumped sales in a third country will understate the degree to which a foreign producer is dumping in the United States. (Id. at 19.)

Second, Alloy contends Kanzen's U.K. sales were not representative because they were made to only one customer. (Id. at 25.) In *Thai Pineapple*, Commerce found that sales were made outside the ordinary course of trade, noting only one customer existed. *Thai Pineapple*, 946 F. Supp. at 16. In the case at hand, Alloy asserts that because Kanzen received only a small number of orders by a single U.K. customer during the POI, the potential for price manipulation precluded a finding that the U.K. sales were representative. (Alloy 56.2 Br. at 26, citing *Koenig & Bauer-Albert AG v. United States*, 15 F. Supp. 2d 834, 840 (Ct. Int'l Trade 1998), *aff'd in part, rev'd in part* (on other grounds), 2001 WL 893900 (Fed. Cir. Aug. 9, 2001).)

Third, Alloy contends Kanzen's U.K. sales should not have been used because the terms of sale were not representative of Kanzen's sales to the United States. (Alloy 56.2 Br. at 27.) Citing the "terms of sale" factor of *Thai Pineapple*, Alloy argues that the terms of sale between Kanzen and its U.K. customer were aberrational and considerably more favorable to its U.K. customer than those offered to Kanzen's U.S. customers. (Alloy 56.2 Br. at 27.)

Fourth, Alloy contends Kanzen's third country sales should not be considered representative because their volume differed only slightly from that of the home market. (Id. at 24.)

Finally, Alloy concludes that Commerce should reconsider using Kanzen's home market sales as the basis for NV. (Id. at 24-25.) Alloy argues both the statute and the regulation express a preference for home market sales as the basis for NV. (Id., citing 19 U.S.C. § 1677b(a)(1)(B) and 19 C.F.R. § 351.404(a).) In this case, adherence to the five percent test subverts the purpose of the law. (Alloy Conf. Br. at 23.)

Alloy asks the Court to remand this case to Commerce with instructions to reconsider all possible choices, including the use of home market sales, as the basis for NV. (Id. at 30.)

## 2. Defendant/United States & Defendant-Intervenors/Kanzen

The United States and Kanzen (collectively "Defendants") contend Commerce's decision to use Kanzen's third country sales to the United Kingdom as the basis for NV is supported by substantial evidence on the record and is otherwise in accordance with law. (Defendant's Memorandum in Opposition to Plaintiffs' and Defendant-Intervenors' Rule 56.2 Motions for Judgment Upon the Agency's Record and Appendix ("U.S. Br." and "U.S. App.") at 12.) Defendant makes two arguments in support of its contention: (1) Commerce properly decided to use Kanzen's third country sales as the basis for NV; and (2) Kanzen's third country prices were representative.

Defendants assert Kanzen's home market sales fell below the five percent threshold required by the so-called viability test, rendering them insufficient for purposes of determining

NV. (Id. at 13-15.) Thus, as Defendant explains, the statute, 19 U.S.C. § 1677b(a)(1)(C), and the corresponding regulation, 19 C.F.R. § 351.404(b)(1), direct Commerce to use third country sales for such purpose. (Id. at 14-15.) Although Defendants agree with Alloy that inclusion of the word "normally" in the statute provides Commerce with some flexibility in applying the five percent test, Defendants contend Alloy has failed to make any convincing argument justifying a departure from the test. (Id. at 24-25.)

Defendants next assert that Kanzen's third country prices were representative. Defendants argue that by simply using the term "representative," without further elaboration, Congress intended to give Commerce the discretion to determine representative prices on a case-by-case basis. (Id. at 18.) Defendants argue Alloy's reliance on the eight-factor approach of *Thai Pineapple* is misguided. (Id. at 23.) Defendants contend the issue in *Thai Pineapple*, which was whether a sale was made outside the ordinary course of trade, is distinguishable from the issue in this case, which is whether Kanzen's third country sales are representative. (Id.)

Defendants refute Alloy's assertion that Kanzen's third country sales to the U.K. were sold at dumped prices and, therefore, not representative. (Id. at 22.) The United States contends (1) Alloy incorrectly applies the "reason to believe or suspect" standard and (2) there is no evidence to support Alloy's contention that Kanzen's third country sales were dumped. (Id. at 19-24.)

Defendants next refute Alloy's claims that Kanzen's U.K. sales are not representative because they were made to only a single customer. (Id. at 25.) As discussed previously, Defendants reject Alloy's reliance on the eight factors laid out in *Thai Pineapple*, distinguishing it from the instant case. (Id. at 26.) Even if the Court were to find the eight factors applicable,

Defendants argue the various factors were evaluated in the aggregate; no one factor was deemed to be dispositive, as Alloy urges in this case. (Id.) Defendants also reject Alloy's claim that the "potential for manipulation" of prices existed because Alloy made no attempt to support its argument with any record evidence. (Id. at 27.)

Third, Defendants refute Alloy's claims that Kanzen's U.K. sales are not representative because Kanzen's terms of sale for its U.K. sales differed significantly from the terms of sale offered on its U.S. sales. (Id.) Defendants point out that Commerce conducted a thorough verification and found no discrepancies. (Id. at 27-28.) Accordingly, Defendants argue, this argument lacks merit. Defendants conclude Kanzen's U.K. sales are representative and urge the Court to deny Alloy's motion for judgment upon the agency record.

B. <u>Analysis</u>:

   *1. The Statutory Scheme*

Under U.S. antidumping law, Commerce determines dumping margins by comparing "the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise." 19 U.S.C. § 1677f-1(d)(1)(A)(i). The question presented in this case is whether Commerce's reliance upon Kanzen's third country sales to the United Kingdom as the basis for normal value ("NV") is supported by substantial evidence on the record and is otherwise in accordance with law. Thus, the Court's analysis begins with an examination of the statute, 19 U.S.C. § 1677b, governing the calculation of NV. The statute first directs Commerce to use the exporter's home market sales as the basis for NV:

   (a)(1)(A) In general

> The normal value of the subject merchandise shall be the price described in subparagraph (B), . . .
>
> (B) Price
>
> The price referred to in subparagraph (A) is –
>
> (i) the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price . . . .

§ 1677b(a)(1)(A) & (B)(i).

Commerce must use the home market so long as it is viable. The home market will be deemed non-viable if:

> (ii) the administering authority determines that the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold in the exporting country is *insufficient* to permit a proper comparison with the sales of the subject merchandise to the United States, or

§ 1677b(a)(1)(C)(ii) (emphasis added).[3] For purposes of subparagraph (ii), *supra*, the statute specifies that home market sales "shall normally be considered to be *insufficient* if such quantity (or value) is less than 5 percent of the aggregate quantity (or value) of sales of the subject merchandise to the United States." § 1677b(a)(1)(C) (emphasis added).

If Commerce determines that the home market is non-viable, the statute directs Commerce to use third country sales as the basis for NV. § 1677b(a)(1)(C). The statute imposes a viability requirement upon third country sales as well. The statutory requirements for Commerce's selection of a third country NV are that:

> (I) such price is representative,

(II) the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold by the exporter or producer in such other country is 5 percent or more of the aggregate quantity (or value) of the subject merchandise sold in the United States or for export to the United States, and

(III) the administering authority does not determine that the particular market situation in such other country prevents a proper comparison with the export price or constructed export price.

§ 1677b(a)(1)(B)(ii). Finally, if Commerce determines that neither the home market nor a third country furnish a viable measure of normal value, the statute directs Commerce to use a constructed value to calculate NV. *See* § 1677b(a)(4).[4]

*2. Commerce's Determination That the Home Market Was Not Viable Is Supported by Substantial Evidence on the Record and Is Otherwise In Accordance With Law*

The Court finds Commerce's determination that Kanzen's home market was not viable for comparison purposes is supported by substantial evidence on the record and is otherwise in accordance with law because the aggregate quantity of home market sales was less than five percent of the aggregate quantity of sales of the subject merchandise to the United States. *See Preliminary Determination*, 65 Fed. Reg. at 47,399. On the other hand, the aggregate volume of Kanzen's U.K. sales was more than five percent of its aggregate volume of U.S. sales. *Id*. Therefore, after conducting full sales verifications of Kanzen's U.K., U.S., and home market sales, Commerce properly determined the home market was not viable.

---

[3] The statute provides two other scenarios that will cause the home market to be non-viable, however, they are not at issue in this case. *See* 19 U.S.C. § 1677b(a)(1)(C)(i) & (iii).

[4] While the statute grants Commerce discretion to choose third country sales or constructed value, Commerce's regulation expresses a preference for third country sales as the basis for NV. The regulation provides:

> (f) *Third country sales and constructed value*. The Secretary normally will calculate normal value based on sales to a third country rather than on constructed value if adequate information is available and verifiable . . . . 19 C.F.R. § 351.404(f) (1994). Commerce followed this sequence in its investigation, first examining home market viability and then proceeding to third country market viability.

The Court rejects Alloy's argument that Commerce's strict adherence to the five percent test in this case is subversive and contradicts the intent of the statute. The Court agrees the statute provides Commerce with flexibility to consider home market sales even if the aggregate volume of sales is less than five percent by stating such sales "shall *normally* be considered to be insufficient . . . ." 19 U.S.C. § 1677b(a)(1)(C) (emphasis added).[5] The Statement of Administrative Action ("SAA") supports this interpretation by explicitly providing an exception to this general rule: "In *unusual situations* . . . home market sales constituting less than five percent of sales to the United States could be considered viable . . . ." H.R.REP. NO. 103-826, at 821, *reprinted in* 1994 U.S.C.C.A.N. 4040, at 4162 (emphasis added).[6]

However, Alloy fails to demonstrate how this is an "unusual situation" that renders the five percent threshold inappropriate, and it points to no supporting evidence in the record. The Court finds Commerce properly chose to proceed to an examination of the viability of Kanzen's third country sales to the United Kingdom as the basis for NV because Commerce followed its consistent practice of strictly abiding by the five percent test as a threshold for viability. *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Wire Rod from Japan*, 63 Fed. Reg. 40,434, 40,441-42 (July 29, 1998). Additionally, this Court has affirmed Commerce's reliance on the five percent threshold absent a showing of some unusual situation that would render its application inappropriate. *See, e.g., Chemetals, Incorporated v.*

---

[5] Commerce notes in the preamble to the final regulations that it "retained the word 'normally' in order to provide the Department with the flexibility to deal with unusual situations." *Antidumping Duties; Countervailing Duties: Final Rule*, 62 Fed. Reg. 27,296, 27,358 (May 19, 1997) ("*Preamble*").

[6] The Court notes the questionnaire Commerce issued to Kanzen states that "[i]f the volume of your home market sales . . . is less than five percent of the volume of your sales to the United States of the subject merchandise . . . contact the official in charge because the Department, *except in unusual situations, will not use your home market as the basis for calculating normal value*." (Alloy Conf. App. Tab 3, at 3 (emphasis added).) This demonstrates to the Court that this is an established practice for Commerce.

*United States*, 138 F. Supp.2d 1338, 1349 (Ct. Int'l Trade 2001) (holding plaintiffs failed to

demonstrate an unusual situation invalidating use of five percent test).

> *3. Commerce's Determination to Use Kanzen's Third Country Sales to the United Kingdom as the Basis for Normal Value is Supported By Substantial Evidence on the Record and is Otherwise in Accordance With Law*

The Court finds Commerce's selection of the United Kingdom as Kanzen's third country

comparison market and its determination that Kanzen's third country sales to the U.K. are viable

is supported by substantial evidence on the record and is otherwise in accordance with law.

Neither the statute, legislative history, nor regulations define "representative," but the

regulation does limit the inquiry of market viability to one criterion:  the sufficiency of sales in

the third country.  *See* 19 C.F.R. § 351.404.  The third country market will be deemed viable if

Commerce is "satisfied that sales of the foreign like product . . . are of sufficient quantity [i.e. 5

percent or more of the aggregate quantity of the subject merchandise to the United States] to

form the basis of normal value."  19 C.F.R. § 351.404(b)(1) & (2).  Once Commerce is satisfied

that the third country market is viable, the party alleging that the prices are not "representative"

bears the burden of "establish[ing] to the satisfaction of [Commerce] that" the criterion is not

met.[7]  *See* § 351.404(c)(2); *Preamble*, 62 Fed. Reg. at 27,357.  In the *Preamble* Commerce

explains its rationale for focusing only on the sufficiency of the sales for the purpose of

establishing viability:

> [T]he criteria of a "particular market situation" and the "representativeness" of prices fall

---

[7] Commerce also commented on the burden of proof in this scenario in its preamble to the final rules:
   [B]y using the phrase "if it is established to the satisfaction of the Secretary" in paragraph (c)(2), we merely were
   attempting to provide that the party alleging . . . that sales are not "representative" has the burden of
   demonstrating that there is a reasonable basis for believing  . . . that sales are not "representative."
   *Preamble*, 62 Fed. Reg. at 27,357.

into the category of issues that the Department need not, and should not, routinely consider. . . . [T]he SAA at 821 recognizes that the Department must inform exporters at an early stage of a proceeding as to which sales they must report. This objective would be frustrated if the Department routinely analyzed the existence of a "particular market situation" or the "representativeness" of third country sales.

*Preamble*, 62 Fed. Reg. at 27,357. The Court finds this approach to be a reasonable application of the statute. The time frame within which Commerce must conduct its investigation is necessarily very short. Therefore, it is sensible to establish a bright line rule for determining viability. Indeed, the SAA states that "[a] clear standard governing most cases is necessary because Commerce must determine whether the . . . market is viable at an early stage in each proceeding to inform exporters which sales to report." SAA at 821. If a party wishes to challenge the use of third country sales because it believes those sales are not representative, there is a procedure for that party to do so.

In this case, Alloy does not dispute Commerce's determination that the aggregate quantity of the foreign like product sold by Kanzen in the U.K. was 5 percent or more of the aggregate quantity of the sales of the subject merchandise to the United States. *See Preliminary Determination*, 65 Fed. Reg. at 47,399. Thus, Kanzen's third country sales to the U.K. are presumptively representative, and the burden is on Alloy to "establish[] to the satisfaction of [Commerce] that . . . the price is not representative . . . ." 19 C.F.R. § 351.404(c)(2)(ii). Alloy contends Commerce erred in basing NV on Kanzen's third country sales to the U.K. because those sales were not "representative" as required by 19 U.S.C. § 1677b(a)(1)(B)(ii)(I). Alloy bases this contention on four factors. For the reasons that follow, the Court finds Alloy has failed to satisfy its burden in this case.

*a. There is No Evidence Kanzen's Third Country Sales Were Dumped*

Alloy argues that Commerce must avoid using any prices that it has "reason to believe or suspect" may be dumped. However, the Court is not persuaded that the standard from non-market economy proceedings should be applied to the determination of a suitable comparison market. Even if it were, Alloy's application of the standard would still be incorrect because the "reason to believe or suspect" standard requires some *formal* finding of dumping. *See, e.g., Issues and Decisions Memo for the 1998-99 Administrative Review of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China, Final Results, reprinted at* 2001 WL 118968 (Jan. 10, 2001) (Comment 1). There was no formal finding of dumping in this case. Thus, the Court finds without merit Alloy's contention that Commerce "could have evaluated for itself (as the domestic industry did) whether Kanzen's U.K. prices were dumped and were therefore unsuitable for use as normal value." (Alloy 56.2 Br. at 21-22.)

Second, while the Court agrees that the goal of accuracy cannot be achieved if Commerce relies upon dumped third country prices to calculate NV, there is simply no record evidence to support Alloy's conjecture here. Alloy provided none of the information normally required in a dumping investigation to perform the necessary margin calculations. Simply having a lower price in the U.K is insufficient for the purpose of demonstrating dumping.

*b. Kanzen's Sales to a Single U.K. Customer Do Not Make Them Unrepresentative*

The Court rejects Alloy's argument that Kanzen's U.K. sales are not representative because they were made to a single customer. First, Alloy's reliance on *Thai Pineapple* is misguided. *Thai Pineapple* is distinguishable from the present case for two reasons. The question presented in *Thai Pineapple* was whether the respondent's sale was outside the ordinary

course of trade, not whether the respondent's third country sales were "representative." Furthermore, in that case this Court was applying pre-Uruguay Round law. The applicable statute, 19 U.S.C. § 1677b, changed significantly after enactment of the Uruguay Round Agreements Act. Indeed, the requirement that a respondent's third country sales be "representative" was added by the Uruguay Round Agreements Act.

Second, Alloy's argument that the existence of only one customer provides the potential for manipulation of prices is flawed for two reasons. First, *Koenig & Brauer-Albert AG* is inapposite. There one of the respondents amended its contracts by increasing the sales price several months after petitioner filed its AD petition. *See Koenig*, 15 F. Supp.2d at 840. The respondent challenged Commerce's refusal to accept the amendments in its margin calculation. This Court upheld Commerce's rejection of the price amendments to the contract based upon the potential for manipulation. To support its conclusion, this Court pointed to Commerce's standard practice "not to accept price adjustments instituted *after* the filing of a petition . . . so as to discourage potential manipulation of potential dumping margins . . . ." *Id*. (internal citations and quotations omitted) (emphasis added). That is simply not the scenario in this case. Here, there was no action taken by Kanzen that would cause Commerce to believe the potential for manipulation existed. Second, and perhaps more significant, Alloy cites no record evidence to support its assertion. Indeed, in rejecting petitioner's claim in *Koenig* this Court noted that the "price amendments themselves, made after the initiation of the investigation, constitute evidence that manipulation may occur." *Id*. There were no adjustments or amendments in this case indicating Kanzen was attempting to manipulate the margin. The Court therefore rejects this argument.

*c. The Difference in U.K.'s Terms of Sale Do Not Make Them Unrepresentative*

The Court also rejects Alloy's final argument that Kanzen's U.K. sales are not representative because Kanzen's U.K. terms of sale differed significantly from its U.S. terms of sale. Differences in the terms of sales do not automatically lead to the conclusion that Kanzen's U.K. sales are not "representative." Alloy does not demonstrate *how* the differences cause them to be unrepresentative. Commerce specifically addressed Alloy's concerns over these differences in the terms of sale in its Decision Memo after conducting a thorough sales verification. For example, with respect to the early payment discount offered by Kanzen to its U.K. customer but not its U.S. customers, Commerce noted that:

> The record is clearly developed from the sales verification as to establish that the early payment discount was applied only to a specific invoice for a U.K. sale, and was specifically calculated according to the details and circumstances of that sale. Furthermore, we . . . found no other early payment discounts during the POI. . . . We are properly treating the discount as a post-sale price adjustment . . . addressed in our normal value calculation.

Decision Memo at Comment 7 (internal citations omitted). Additionally, Commerce addressed petitioners concerns over the change in terms of payment from FOB to CIF, stating:

> This further supports our basis for using invoice date as the date of sale in the comment section on "Market viability," . . . and our determination that the material terms of sale for the U.K. market during the POI were not necessarily established at confirmation/contract date, but rather remained alterable by the parties after that time.

*Id*. at Comment 6. Commerce concluded that the differences in the terms of sale did not affect market viability:

> As for the substantial changes which petitioners claim render the U.K. market an improper comparison market, while such changes serve to justify the choice of invoice date as the date of sale, they are not so problematical or anomalous as to place the viability of the U.K. market in question. In fact, Kanzen provided at verification full documentation regarding these changes. This documentation supports a conclusion that

these circumstantial changes were made in the ordinary course of business, and do not support petitioners' assertion that these constituted "unique" post-sale adjustments specifically designed "to lower the selling price for it's {sic} U.K. market."  See Petitioner's Brief at 12.

Decision Memo at Comment 2.  The Court finds Commerce thoroughly considered these discrepancies during the investigation.   The Court therefore holds Commerce's decision to use Kanzen's third country sales to the U.K. as the basis for NV is supported by substantial evidence on the record and is otherwise in accordance with law.

**II.  Kanzen's Renewed Motion to Supplement the Administrative Record and Motion for Judgment Upon the Agency Record**

A.  Background

Kanzen brings two motions before the Court.  First, Kanzen renews its motion to supplement the administrative record.  Second, Kanzen alleges in its motion for judgment upon the agency record that Commerce failed to correct certain alleged ministerial errors.

Kanzen alleges that its August 15, 2000 Section C supplemental questionnaire response contained ministerial errors in the reporting of payment dates and credit expenses for 64 of its listing of 10,028 U.S. sales.  (Memorandum of Points and Authorities in Support of Plaintiff, Kanzen Tetsu's CIT Rule 56.2 Motion for Judgment Upon the Agency Record (Confidential Version) ("Kanzen 56.2 Br.") at 4.)  Kanzen alleges that an incorrect high value of $42.00 was reported as the credit expense for these 64 sales.  (Id. at 5; Kanzen Conf. App. Tab 4)   Kanzen claims it prepared its Section C U.S. sales listing using Microsoft Excel, and originally reported "#N/A" in those fields that required calculated values (e.g. credit expenses) for which the number was not available since payment had not been received at the time of filing.  (Kanzen

56.2 Br. at 8.)  Kanzen asserts the credit expense errors resulted from a technical problem in the

SAS software when "#N/A" in the Excel spreadsheet was converted into SAS format.  (Id.)

Kanzen alleges that the program incorrectly converted the symbol "#N/A" into the numeric value

"42.00."  Kanzen claims the $42.00 amount was hundreds of times higher than most of the credit

expenses reported for Kanzen's 9,964 other U.S. sales.  (Id. at 6.)  Kanzen asserts that, but for

the computer conversion error, the *de minimis* margin calculated in the *Preliminary*

*Determination* would have remained in effect for the *Final Determination*.  As noted earlier,

Commerce declined to correct the alleged errors.


B.  <u>Kanzen's Renewed Motion to Supplement the Administrative Record</u>

The Court notes the standard of review governing the merits of the underlying action, is

whether it is unsupported by substantial evidence *on the record*, or otherwise not in accordance

with law."  19 U.S.C.  1516a(b)(1)(B)(i) (emphasis added).  Judicial review is therefore limited

to the evidence contained in the administrative record.  *See Kerr-McGee Chem. Corp. v. United*

*States*, 955 F. Supp. 1466, 1471 (Ct. Int'l Trade 1997) (citing *Neuweg Fertigung GmbH v.*

*United States*, 797 F. Supp. 1020, 1022 (Ct. Int'l Trade 1992)).  The administrative record for

review shall consist of:

> (i) a copy of all information presented to or obtained by the Secretary, the administering
> authority, or the Commission *during the course of the administrative proceeding*,
> including all governmental memoranda pertaining to the case and the record of ex parte
> meetings required to be kept by section 1677f(a)(3) of this title; and
> (ii) a copy of the determination, all transcripts or records of conferences or hearings, and
> all notices published in the Federal Register.

19 U.S.C. § 1516a(b)(2)(A) (emphasis added).  The statute and case law of this Court are clear that the administrative record is limited to "the information that was presented to or obtained by the agency making the determination during the particular review proceeding for which section 1516 authorizes judicial review."[8]  *Beker Indus. Corp. v. United States*, 7 CIT 313, 316 (1984); *see also Kerr-McGee*, 955 F. Supp. at 1472; *Win-Tex Prods., Inc. v. United States*, 797 F. Supp. 1025, 1026 (Ct. Int'l Trade 1992).  The Court has also held that "[a]ny information received by Commerce after the particular determination at issue is not part of the reviewable record." *Intrepid v. Pollock*, 15 CIT 84, 85 (1991) (citing *Ipsco, Inc. v. United States*, 715 F. Supp. 1104, 1109 (Ct. Int'l Trade 1989).  The "particular determination at issue" in this case is the ITA's *Final Determination* published on December 27, 2000.  Therefore, the administrative record in this case consists of all materials submitted to or obtained by the ITA between the initiation of the AD investigation on January 18, 2000 and the publication of the *Final Determination* on December 27, 2000.

This Court has consistently held that "[i]f ministerial errors exist in the Final Determination, they will be manifest in the administrative record as submitted and plaintiff can ask this Court for a remand to correct any such errors based on the record as submitted."  *NSK Ltd. v. United States*, 788 F. Supp. 1228, 1229 (Ct. Int'l Trade 1992); *see also Brother Indus., Ltd. v. United States*, 771 F. Supp. 374, 384, 388 (Ct. Int'l Trade 1991); *Koyo Seiko*, 746 F.

---

[8] The legislative history of the Trade Agreements Act of 1979 is also clear on this point.  The Senate Committee on Finance specifically stated:

> Judicial review of determinations subject to the provisions of subsection (a)(1) would proceed upon the basis of information before the relevant decision-maker *at the time the decision was rendered* including any information that has been compiled as part of the formal record.  The court is not to conduct a trial *de novo* in reviewing such determinations.

S. REP. NO. 96-249 at 247-48 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 633 (emphasis added).

Supp. at 1110; *Serampore*, 696 F. Supp. at 673.  Kanzen contends *NSK Ltd*. is distinguishable

from the present case.  There Commerce neither retained the parties' submissions nor made a

ruling on the request for correction.  Kanzen claims the instant case is different because

Commerce accepted and retained the parties' submissions and issued a decision memorandum

denying the request for correction.  Thus, those documents should be considered part of the

administrative record.  (Kanzen 56.2 Br. at 9-10.)  The Court finds this is a distinction without a

difference.  The materials are not properly part of the record because they had no bearing on

Commerce's findings and decisions in its *Final Determination*.  If an error was committed, it

will be "manifest from the record as submitted."  The Court, therefore, denies Kanzen's renewed

motion to supplement the administrative record.

C.  Kanzen's Motion for Judgment Upon the Agency Record

*1.  Contentions of the Parties*

    *a.  Defendant-Intervenors/Kanzen*

Kanzen contends that Commerce's decision not to correct certain alleged ministerial

errors ("ME") in its *Final Determination* is unsupported by substantial evidence on the record

and not otherwise in accordance with law.  (Id. at 2.)  Kanzen supports this contention with three

main arguments:  (1) Commerce's decision is inconsistent with the case law of both this Court

and the Court of Appeals for the Federal Circuit ("CAFC" or "Federal Circuit"); (2) statutory

authority does not prohibit Commerce from correcting a respondent's clerical errors; (3)

Commerce's *Final Determination* cannot be supported by substantial evidence if an error exists

in the record.

First, Kanzen argues that Commerce's failure to correct certain ME's was an abuse of discretion and not consistent with this Court's precedent. (Id. at 13-17, citing *Koyo Seiko Co. v. United States*, 746 F. Supp. 1108 (Ct. Int'l Trade 1996); *Technoimportexport v. United States*, 766 F. Supp. 1169, 1179 (Ct. In'tl Trade 1991); *Serampore v. United States*, 696 F. Supp. 665, 673 (Ct. Int'l Trade 1988)). Kanzen notes that both this Court and the CAFC have stated that the statutory goal of calculating accurate dumping margins often outweighs the interest of finality, particularly where the correction does not pose a significant burden on Commerce. (Id. at 13.) Kanzen contends the CAFC's holding in *NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995) is controlling and the alleged errors should be corrected. (Kanzen 56.2 Br. at 24.) Kanzen notes the issue in *NTN Bearing* was whether Commerce's refusal to accept corrections resulting from the respondent's error after the time for submitting new factual information had expired was an abuse of discretion. The CAFC held Commerce's refusal did constitute an abuse of discretion because "[c]orrection of NTN errors would neither have required beginning anew nor have delayed making the final determination. A straightforward mathematical adjustment was all that was required." (Id. at 23, quoting *NTN Bearing*, 74 F.3d at 1208.)

Kanzen contends Commerce's rejection of Kanzen's request for correction of ME's as untimely is clearly not in accordance with *NTN Bearing* because the statutory provision cited by the CAFC, as well as Commerce's regulation, expressly provide that Commerce is permitted to correct clerical errors after a final determination is issued. (Kanzen 56.2 Br. at 24, citing 19 U.S.C. § 1675(h); 19 C.F.R. § 351.224(c).) Correcting the errors would not pose a burden on Commerce since it would merely require an adjustment to the computer program to correct the

deficiency.  Commerce could then simply rerun the program.  (Kanzen 56.2 Br. at 21-22.)

Kanzen asserts this Court has also specifically recognized that computer programming errors are the type of ME's Commerce should correct.  (Id. at 26-27, citing *Toyota Motor Sales, U.S.A., Inc. v. United States*, 930 F. Supp. 636 (Ct. Int'l Trade 1996); *Torrington Co. v. United States*, 853 F. Supp. 446 (Ct. Int'l Trade 1994); *Federal Mogul Corp. v. United States*, 872 F. Supp. 1011 (Ct. Int'l Trade 1994).)  Kanzen concedes the three cases cited involved situations in which the errors committed were in Commerce's own margin calculation program.  (Id. at 27.) Nonetheless, Kanzen argues in each case this Court sought accurate determinations, demonstrating that accuracy frequently weighs more heavily in the balance against finality.  (Id.)

Second, Kanzen argues that nothing in the statute, legislative history, or Commerce's regulations *prohibits* Commerce from correcting the clerical errors existing in this case.  (Id. at 18 (emphasis added).)  Kanzen notes that neither the statute nor Commerce's regulation specify whose errors may be deemed ministerial.  (Id. at 18-20, citing 19 U.S.C. § 1673d(e); 19 C.F.R. § 351.224(c)(1), (e), & (f).)  Furthermore, Kanzen argues, the Conference Report accompanying Section 1333 of the Omnibus Trade and Competitiveness Act of 1988 (establishing procedures for the correction of ME's) expresses concern for the accuracy of Commerce's final determinations, but it does not create any requirement that Commerce correct only its own errors. (Kanzen 56.2 Br. at 19, citing H.R. Conf. Rep. 100-576 at 109, Apr. 20, 1988.)  Kanzen concedes that the *Preamble* states the regulation applies only "to errors made by the Department."  (Kanzen 56.2 Br. at 20, citing *Preamble*, 62 Fed. Reg. at 27,327.)  However, Kanzen asserts Commerce qualifies this by acknowledging it has a practice of correcting clerical errors made by a respondent "if the Department can assess from the information already on the

record that an error has been made, that the error is obvious from the record, and that the

correction is accurate." (Kanzen 56.2 Br. at 20, citing *Preamble*, 62 Fed. Reg. at 27,327.)

Kanzen argues that it satisfies each of the three prongs of this test. (Kanzen 56.2 Br. at 20-21.)

Third, Kanzen contends Commerce's decision is unsupported by substantial evidence.

(Id. at 28.) Kanzen argues the record clearly shows the final margin calculated by Commerce

incorporated incorrect credit expenses reported for certain sales. This error was an inadvertent

programming conversion error that fundamentally affects the accuracy of the margin. Kanzen

argues Commerce's determination cannot be supported by substantial evidence when contrary

evidence demonstrates the *Final Determination* is fundamentally inaccurate. (Id.) Kanzen

contends the Court should remand to Commerce for correction of these errors. (Id. at 30.)


### b. Defendant/United States & Plaintiffs/Alloy

The United States and Alloy contend Commerce's decision not to correct Kanzen's

alleged ministerial errors is supported by substantial evidence on the record and otherwise in

accordance with law.

First, United States and Alloy argue that the respondents bear the burden of creating an

adequate and accurate record within the prescribed statutory time limits. (U.S. Br. at 30-31,

citing, *Tianjin Machinery Import & Export Corp. v. United States*, 806 F. Supp. 1008, 1015 (Ct.

Int'l Trade 1992); Domestic Industry's Response to Kanzen Tetsu's Rule 56.2 Motion for

Judgment Upon the Agency Record ("Alloy Resp. Br.") at 14, citing *RHP Bearings v. United

States*, 875 F. Supp. 854, 857 (Ct. Int'l Trade 1995).) United States and Alloy contend this Court

has held Commerce is not required to correct a respondent's errors when erroneous data is

reported and not timely corrected. (Alloy Resp. Br. at 14-15.) Accordingly, United States and Alloy argue Kanzen's failure to submit correct data in the August 15, 2000 submission remains its own responsibility, and Commerce did not abuse its discretion by not correcting the alleged errors. (U.S. Br. at 31; Alloy Resp. Br. at 15.)

Second, United States and Alloy distinguish the case law used by Kanzen in support of its position that Commerce should have corrected Kanzen's alleged error. In *Koyo Seiko*, United States and Alloy note that the final margin was 70.44 percent, a drastic difference from the final margin of 7.51 percent in this case. Thus, there was no reason to believe the *Final Determination* was tainted with numerous ME's as in *Koyo Seiko*. Additionally, unlike the scenario in *Koyo Seiko*, Commerce never possessed a hard copy of the Excel spreadsheet data and only learned of the alleged errors after issuing the *Final Determination*. (U.S. Br. at 32-34; Alloy Resp. Br. at 17, n.7.) In *Technoimportexport*, the respondents notified Commerce prior to the final determination and the Court directed Commerce to make the correction. (U.S. Br. at 34.) Finally, in *Serampore*, the Court had already ordered a remand for Commerce to reconsider a separate issue and so also directed Commerce to determine whether there was an error in the computer input calculation. Here, there has been no remand ordered, thus there is no similar basis to remand for the correction of the alleged errors. (U.S. Br. at 35.) Furthermore, United States and Alloy emphasize that in all three computer error cases cited by Kanzen, Commerce committed the programming errors. Thus, the computer error cases support the position that only Commerce's ministerial errors are the type of errors to be corrected. (Id. at 35-36.)

United States and Alloy also distinguish *NTN Bearing* from the present case. United States and Alloy note in *NTN Bearing* the respondent informed Commerce of its own error in its

case brief filed three months prior to the issuance of the final determination. (Id. at 39.) The

CAFC noted that because the respondent informed Commerce of the alleged errors shortly after

the preliminary determination, "the tension between finality and correctness simply did not exist

at the time NTN requested correction." (Id. at 39, quoting *NTN Bearing*, 74 F.3d at 1208.) In

this case, Kanzen notified Commerce of the alleged errors *after* the *Final Determination*,

heightening the "tension" between the strict statutory time limits for correcting ME's and the

need for correctness. (U.S. Br. at 39-40.) United States and Alloy posit that if interested parties

were allowed to submit unlimited lists of their own alleged errors after a final determination,

Commerce might never be able to complete its work within the statutory time limits. (Id. at 40.)

Third, United States and Alloy argue neither the statute, legislative history, nor

Commerce's regulations *require* Commerce to correct respondent's errors following a final

determination. (Id. at 36.) (emphasis added). United States and Alloy assert Congress provided

for the correction of ME's because it recognized the need to report dumping margins as

accurately as possible. (Id.) However, United States and Alloy note the *Preamble* clearly

applies the procedures for correction of ME's only to errors attributable to Commerce. (Id. at 38,

citing *Preamble*, 62 Fed. Reg. at 27,327.) In addition, United States and Alloy argue Commerce

will accept corrections of respondent's errors under the six conditions outlined in *Certain Fresh*

*Cut Flowers From Colombia; Final Results of Antidumping Duty Administrative Reviews*, 61

Fed. Reg. 42,833 (Aug. 19, 1996) ("*Colombian Flowers*"). (U.S. Br. at 41.) United States and

Alloy point out that Commerce corrected other clerical errors properly brought to its attention

immediately after the *Preliminary Determination*, but Kanzen failed to avail itself of these

corrective procedures for the errors at issue in this case. (Id. at 41-42, citing Decision Memo at

Comment 1.)

Fourth, United States and Alloy reject Kanzen's argument that the error in this case is "obvious," and therefore excepts a respondent from the burden of submitting accurate data. (Alloy Resp. Br. at 21.) United States and Alloy claim the error could not be "obvious" since Kanzen did not notice its own error in the four months that passed between its August 15, 2000 submission and the issuance of the *Final Determination*. (Id.) United States and Alloy also reject Kanzen's argument that Commerce should have realized an error existed because the final margin calculations were affirmative in comparison to the *de minimis* preliminary determination. (Alloy Resp. Br. at 22.) United States and Alloy argue Commerce made many significant changes between the *Preliminary* and *Final Determinations*, including changes to the third-country and U.S. databases, Kanzen's addition of new U.S. selling expenses in the August 15, 2000 submission, and the use of facts available in certain instances. (Id. at 22; U.S. Br. at 43.)

Finally, United States and Alloy contend correction of Kanzen's alleged error would require additional fact-finding. (Alloy Resp. Br. at 23.) United States and Alloy assert that during the course of the investigation, Kanzen did not fully disclose the nature of its U.S. credit expense calculation. Further, Kanzen never submitted its Excel database or disclosed that it was submitting new payment dates for certain sales on August 15,2000, and it never revealed that it had not received payment for other sales. (Id. at 24.) United States and Alloy argue that it would have been improper for Commerce to have accepted at face value the new claims and factual assertions submitted by Kanzen after the *Final Determination* was issued. (Id.) Thus, Commerce's decision to reject Kanzen's claims that a clerical error had been submitted was not an abuse of discretion.

*2. Analysis*

The statute governing the correction of ministerial errors directs Commerce to "establish procedures for the correction of ministerial errors in final determinations within a reasonable time after the determinations are issued . . . ." 19 U.S.C. § 1673d(e). The regulations promulgated pursuant to the statute set out the "[p]rocedures for the correction of ministerial errors," allowing parties to "submit comments concerning any ministerial error" in the calculations and commanding the Secretary to "analyze any comments received and, if appropriate, . . . correct any ministerial error by amending the final determination . . . ." 19 C.F.R. § 351.224(c), (e) (2000). The term "ministerial error" is defined in the regulation as "an error in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, and any other similar type of unintentional error which the Secretary considers ministerial." § 351.224(f).

Commerce's stated practice is to correct only its own errors: "The provisions of § 351.224—covering disclosure of *the Department's* calculations and procedures for correction of ministerial errors . . . [apply] only to errors made by the Department." *Preamble*, 62 Fed. Reg. at 27,327 (emphasis in original). Furthermore, Commerce has stated that "[e]rrors made by *respondents* in their submissions to the Department, such as transposing digits as a result of a data input error or other computer errors resulting in the omission of data . . . are not governed by the provisions of § 351.224." *Id.* (emphasis in original). The Court finds it is a reasonable application of the statute for Commerce to limit the correction of ME's to those attributable to Commerce.

Applying Commerce's standard practice to the facts of this case, it is clear that Kanzen's alleged errors are not properly subject to correction under the provisions of 19 C.F.R. § 351.224. The errors allegedly occurred during the conversion of data from Microsoft Excel to SAS. The data was under the control of Kanzen both before and after the conversion. Thus, this is an issue of "[e]rrors made by respondents in their submission" to Commerce "as a result of a data input error or other computer errors." *Id.*

The general rule with regard to a respondent's submission of data to Commerce during the course of an AD investigation or review is that the respondent bears the burden and responsibility of creating an accurate record within the statutory timeline. *See RHP Bearings v. United States*, 875 F. Supp. 854, 857 (Ct. Int'l Trade 1995); *see also Yamaha Motor Co., Ltd. v. United States*, 910 F. Supp. 679, 687 (Ct. Int'l Trade 1995) ("It is the respondent's obligation to supply Commerce with accurate information."); *Societe Nouvelle De Roulements v. United States*, 910 F. Supp. 689, 694 (Ct. Int'l Trade 1995) ("*SNR*") ("Respondents 'must submit accurate data' and 'cannot expect Commerce, with its limited resources to serve as a surrogate to guarantee the correctness of submissions.'").

Furthermore, this Court has held that Commerce is not required to correct a respondent's errors when erroneous data are reported and not timely corrected. *See Sugiyama*, 797 F. Supp. at 994 (stating "[e]ven if Commerce possessed the personnel to identify errors Plaintiffs made in their data base within the statutory deadlines, Commerce would have no basis for deciding which portion of the submission was correct or erroneous."); *Makita Corp. v. United States*, 974 F. Supp. 770, 780 (Ct. Int'l Trade 1997); *see also Acciai Speciali Terni S.p.A. v. United States*, 142 F. Supp. 2d 969, 982 (Ct. Int'l Trade 2001) ("It is respondent's obligation to supply Commerce

with accurate information. . . . In general, Commerce is not required to correct a respondent's errors when erroneous data [are] reported and not timely corrected.") (internal quotations and citations omitted).

However, recognizing that the volume of information respondents must submit to Commerce during an investigation can lead to errors, Commerce has long had a policy of correcting a respondent's clerical errors submitted prior to the final determination. In the *Preamble*, Commerce explained that "[p]rior to the deadline for submission of factual information, the Department's practice normally is to accept a respondent's correction of an error in its own data because the Department has time to review, analyze, and where applicable, verify the corrected data." 62 Fed. Reg. at 27,327. Even though it has not promulgated a regulation, Commerce's current practice is outlined in *Colombian Flowers*. Commerce explained that it would accept corrections to a respondent's clerical errors under the following six conditions:

> (1) The error in question must be demonstrated to be a clerical error, not a methodological error, an error in judgment, or a substantive error; (2) the Department must be satisfied that the corrective documentation provided in support of the clerical error allegation is reliable; (3) the respondent must have availed itself of the earliest reasonable opportunity to correct the error; (4) the clerical error allegation, and any corrective documentation, must be submitted to the Department no later than the due date for the respondent's administrative case brief; (5) the clerical error must not entail a substantial revision of the response; and (6) the respondent's corrective documentation must not contradict information previously determined to be accurate at verification.

*Colombian Flowers*, 61 Fed. Reg. at 42,834. This Court recognized this methodology in *World Finer Foods, Inc. v United States*, No. 99-03-00138, 2000 WL 897752 (CIT June 26, 2000). In this case, Commerce promptly corrected those clerical errors brought to its attention immediately after the *Preliminary Determination*. *See* Decision Memo at Comment 1. Based on this methodology, the Court finds it was Kanzen's responsibility to ensure the accuracy of the data it

submitted on August 15, 2000. Kanzen's failure to meet its responsibility does not shift the burden to Commerce. Therefore, Commerce's decision not to reexamine Kanzen's data to determine when, how, and why Kanzen's alleged error was committed was not an abuse of discretion. Respondent simply did not avail itself of a system specifically designed to remedy the issue in this case.

The parties' arguments regarding the obviousness of the alleged errors in this case are misplaced. After *NTN Bearing*, Commerce has shifted its focus from obviousness and the other factors of the three-pronged test to the six factors outlined in *Colombian Flowers*.[9] It was in response to the CAFC's ruling that Commerce decided to reevaluate its methodology for correcting a respondent's clerical errors and developed the six factor approach outlined in *Colombian Flowers*. *See Preamble*, 62 Fed. Reg. at 27,327.

The Court recognizes the tension between finality and correct result raised by the issues in this case. *See NTN Bearing*, 74 F.3d at 1208. Unlike the situation in *NTN Bearing* and *World Finer Foods*, however, Kanzen did not raise this issue until after the *Final Determination* was issued. In *World Finer Foods*, respondent had attempted to make the correction from the time of the publication of the preliminary results. *World Finer Foods*, 2000 WL 897752, at *9. Similarly, in *NTN Bearing*, respondent had informed Commerce of the alleged errors shortly after the preliminary determination. Thus, in both cases the courts found that at the time respondents requested the correction, the tension between finality and correctness simply did not exist. *See NTN Bearing*, 74 F.3d at 1208; *World Finer Foods*, 2000 WL 897752, at *9. Kanzen

---

[9] The CAFC held that "while it may be a reasonable exercise of ITA's discretion to restrict the correction of its own clerical errors to those *obvious* from the record, the same rule applied to a respondent's errors becomes arbitrary." *NTN Bearing*, 74 F.3d at 1208. (emphasis added).

had more than enough time to check its data between the date of submission and the issuance of the *Final Determination*.

The following examples demonstrate that Kanzen's claim that its ministerial error correction request would not require Commerce to conduct any further factual analysis in order to correct the ministerial errors is simply incorrect. Commerce even examined one of the particular sales that Kanzen claims included the alleged error during the sales verification. In respect to that sale Commerce noted "[r]egarding the pay date, which had been reported as 2/1/00, Kanzen did not know why this date was included in the data set." *Sales Verification Report* at 23. Commerce then "confirmed that there were no transactions on that day with any of Kanzen's banks which pertained to a POI sale of subject merchandise." *Id*. Kanzen suggests that the data conversion error resulted in the incorrect 02/11/00 payment date being reported. (Kanzen's 56.2 Br. at 5, n. 8.) However, that Commerce later found that a reported payment date was erroneous at verification does not explain why the conversion from Excel to SAS would have spontaneously created a payment date that previously did not exist. Also, the credit expense of "42.00" was reported for sales with different payment dates, not just the February 11, 2000 payment date.

Additionally, and perhaps most significant is the fact that Kanzen did not submit its Microsoft Excel spreadsheet containing the original credit expense data as part of its August 15, 2000 submission. Therefore, Commerce would necessarily have to make some factual inquiries to determine what data was originally submitted by Kanzen. Commerce could not simply apply a new programming methodology without investigating the original data before and after the conversion. Kanzen should have been alerted to potential errors and investigated its data

submission after its exchange with Commerce during verification.  Procedures exist allowing

respondents to correct submitted data.  Kanzen's failure to follow those procedures in this case is

fatal to its position.

## CONCLUSION

For the reasons stated above, the Court finds Commerce's *Final Determination* is supported by substantial evidence and is otherwise in accordance with law. Defendant-Intervenors' renewed motion to supplement the administrative record is denied. Furthermore, Plaintiffs' and Defendant-Intervenors' respective motions for judgment upon the agency record are denied. Defendant-Intervenors' application for oral argument is denied.

_____
Gregory W. Carman,
Chief Judge

Dated: March 11, 2002
      New York, New York

ERRATUM


*Alloy Piping Products, Inc., et al. v. United States,* Consol. Court No. 01-00099, Slip-Op. 02-27, Dated March 11, 2002.


On Page 1 in the case caption, the party "TAYLOR GORGE STAINLESS, INC." should read "TAYLOR FORGE STAINLESS, INC."


March 18, 2002