334 F.3d 1284
 ALLOY PIPING PRODUCTS, INC., Flowline Division, Markovitz Enterprises, Inc., Gerlin, Inc., and Taylor Forge Stainless, Inc., Plaintiffs-Appellees, and
United States, Defendant-Appellee,
v.
KANZEN TETSU SDN. BHD., Defendant-Appellant, and
Schulz (Mfg) Sdn. Bhd. and Schulz U.S.A., Inc., Defendants.
 No. 02-1396.
 United States Court of Appeals, Federal Circuit.
 DECIDED: June 27, 2003.
 
 Frank H. Morgan, White & Case, LLP, of Washington, DC, argued for defendant-appellant. With him on the brief were Walter J. Spak and Robert G. Gosselink.
 Mary T. Staley, Collier Shannon Scott, PLLC, of Washington, DC, argued for plaintiffs-appellees. With her on the brief was Jeffrey S. Beckington.
 Stephen C. Tosini, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director; Lucius B. Lau, Assistant Director. Of counsel on the brief were John D. McInerney, Chief Counsel, Berniece A. Browne, Senior Counsel, and Robert E. Nielsen, Senior Attorney, Department of Commerce, of Washington, DC.
 Before SCHALL, GAJARSA, and DYK, Circuit Judges.
 DYK, Circuit Judge.
 
 
 1
 Kanzen Tetsu Sdn. Bhd. ("Kanzen") appeals the decision of the United States Court of International Trade sustaining the final affirmative antidumping duty determination issued by the Department of Commerce ("Commerce"). Alloy Piping Prods., Inc. v. United States, 201 F.Supp.2d 1267, 1269 (C.I.T.2002). Kanzen argues that Commerce was required to correct an alleged error in its final determination. We hold that Commerce's refusal to correct the alleged error was not arbitrary and capricious, because (1) Kanzen itself was the source of the error; (2) Kanzen did not call attention to the error until after the issuance of the final determination; and (3) there was no showing that the error was or would have been apparent to Commerce before it issued the final determination. We therefore affirm the decision of the Court of International Trade.
 
 BACKGROUND
 
 2
 * Commerce is required to impose antidumping duties on "foreign merchandise [that] is being, or is likely to be, sold in the United States at less than its fair value." 19 U.S.C. § 1673(1) (2000); Micron Tech., Inc. v. United States, 243 F.3d 1301, 1303 (Fed.Cir.2001). Commerce determines antidumping duties by first calculating the "dumping margin," which is "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." 19 U.S.C. § 1677(35)(A) (2000); Koyo Seiko Co. v. United States, 258 F.3d 1340, 1342 (2001). Commerce is then obligated by statute "to use the dumping margin as `the basis for the assessment of countervailing or antidumping duties on entries of merchandise covered by the [antidumping] determination and for deposits of estimated duties.'" Koyo Seiko, 258 F.3d at 1342 (quoting 19 U.S.C. § 1675(a)(2)(C)). A duty is then imposed if the International Trade Commission ("ITC") determines that an industry in the United States is "materially injured, or is threatened with material injury" or "the establishment of an industry in the United States is materially retarded" by the sale of foreign products at less than fair value. 19 U.S.C. § 1671b(a)(1) (2000).
 
 
 3
 The "export price" or "constructed export price" referred to in section 1677(35)(A) is the price charged by importers in the United States. Micron Tech., 243 F.3d at 1303. By statute, certain upward and downward adjustments must be made to the export price before calculating the dumping margin. Pertinent to this appeal, Commerce must reduce the export price by "expenses that result from, and bear a direct relationship to, the sale, such as credit expenses." 19 U.S.C. § 1677a(d)(1)(B) (2000). Hence, a large credit expense per sale will result in a lower export price and a greater dumping margin.
 
 
 4
 By statute, Commerce must establish a procedure for the correction of "ministerial errors" that may occur in its final determinations:
 
 
 5
 The administering authority shall establish procedures for the correction of ministerial errors in final determinations within a reasonable time after the determinations are issued under this section. Such procedures shall ensure opportunity for interested parties to present their views regarding any such errors. As used in this subsection, the term "ministerial error" includes errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error which the administering authority considers ministerial.
 
 
 6
 19 U.S.C. § 1673d(e) (2000).
 
 
 7
 Pursuant to this statute, Commerce has promulgated a regulation providing that "[a] party to the proceeding to whom the Secretary has disclosed calculations performed in connection with a final determination or the final results of a review may submit comments concerning any ministerial error in such calculations." 19 C.F.R. § 351.224(c)(1) (2002). Under the regulation, parties must file comments concerning ministerial errors within five days of the disclosure of the final dumping margin calculations. Id. § 351.224(c)(2). Parties can also apply for an extension, allowing them to file ministerial error comments five days after the publication of the final determination. Id. § 351.224(c)(4). The regulation further provides: "[t]he Secretary will analyze any comments received and, if appropriate ... correct any ministerial error by amending the final determination." Id. § 351.224(e). The definition of "ministerial error" is identical to that found in the statute: "an error in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, and any other similar type of unintentional error which the Secretary considers ministerial." Id. § 351.224(f). Neither the statute nor the regulation specifies whether the definition of ministerial error includes errors made by private parties in the proceeding.
 
 II
 
 8
 On December 29, 1999, the private appellees in this action, Alloy Piping Products, Inc., Flowline Division, Markovitz Enterprises, Inc., Gerlin, Inc., and Taylor Forge Stainless, Inc., filed a petition with Commerce asking that it investigate the importation of pipe fittings from Germany, Italy, Malaysia, and the Philippines. Commerce initiated the antidumping investigation on January 18, 2000, to determine whether pipe fittings imported from those countries should be assessed an antidumping duty. Stainless Steel Butt-Weld Pipe Fittings From Germany, Italy, Malaysia and the Philippines, 65 Fed. Reg. 4595, 4596 (Dep't Commerce Jan. 31, 2000) (Initiation of Antidumping Duty Investigations). On February 24, 2000, the ITC determined "that there was a reasonable indication that an industry in the United States was being materially injured by reason of imports of the subject merchandise from Malaysia." Alloy Piping Prods., 201 F.Supp.2d at 1269.
 
 
 9
 As one of the importers from Malaysia subject to the investigation, on May 1, 2000, Kanzen submitted to Commerce information on its sales in the United States in the form of a spreadsheet document. In this initial submission, Kanzen left blank the spreadsheet fields for credit expenses related to United States sales. Commerce twice required Kanzen to submit supplemental responses, because, among other reasons, Kanzen had either left blank certain fields in the spreadsheet or had entered negative figures or zero. Commerce did not specifically mention the credit expense field. Kanzen submitted its supplemental responses in the form of revised spreadsheets on June 16, 2000, and July 10, 2000. In both of these supplemental responses, the field for entry of credit expenses remained blank. It is not clear from the record whether the supplemental responses consisted of computer printouts or if they also included electronic databases, and if so, whether they were in Microsoft Excel or in some other format.
 
 
 10
 Commerce issued a preliminary determination on August 2, 2000. Commerce determined "that it would not be practicable to investigate all four Malaysian producers/exporters, and therefore limited [its] examination to the largest producer/exporter, Kanzen." Stainless Steel Butt-Weld Pipe Fittings from Malaysia, 65 Fed. Reg. 47,398, 47398 (Dept. Commerce Aug. 2, 2000) (Preliminary Determination). Based on its investigation of Kanzen, Commerce "preliminarily determine[d] that [pipe fittings] from Malaysia are not being sold, nor are likely to be sold, in the United States at less than fair value." Id. Commerce estimated that the weighted-average dumping margin was 0.59% and "therefore de minimis." Id. at 47,402. Commerce announced that it would verify all information relied upon in making the preliminary determination and postpone its final determination for 135 days.
 
 
 11
 On August 15, 2000, at the request of Commerce, Kanzen submitted a final electronic database reporting its United States sales. Commerce's filing instructions recommended submitting databases in SAS format, but also stated "[i]f you do not have PC SAS, contact the official in charge to determine other suitable formats." (J.A. at 4.) Kanzen submitted its database in SAS format and claims that, in order to do so, it had to convert its sales information from Microsoft Excel format to SAS format. In this new submission, the credit expense for 64 sales was now reported as $42.00 per sale. Kanzen claims that these entries were erroneous. Kanzen alleges that it had originally entered "#N/A" in the Excel database fields to stand for "number not available," but that when it converted its database from the Excel format to the SAS format, "a[n] SAS conversion problem resulted in `#N/A' being converted into the numeric value `42.00.'" (Appellant's Br. at 6-7.) Although Kanzen performed this conversion from Excel to SAS itself, and although the SAS database remained in Kanzen's control prior to its final submission to Commerce, Kanzen did not notify Commerce of this alleged error until after the issuance of the final determination.
 
 
 12
 After conducting and publishing a verification of Kanzen's sales information, receiving briefs from Kanzen and from the private appellees in this action, inviting comments on its preliminary determination, and holding a public hearing on November 22, 2000, Commerce made its final calculations available to Kanzen on December 20, 2000. Letter from Kanzen to Commerce of Dec. 21, 2000. These calculations included the entry of $42.00 as a credit expense for sixty-four sales that Kanzen alleges was erroneous. However, Kanzen did not, at this time, alert Commerce that it believed the $42.00 credit expense to be erroneous. Commerce issued its final determination on December 27, 2000. Stainless Steel Butt-Weld Pipe Fittings from Malaysia, 65 Fed. Reg. 81,825, 81,826 (Dep't Commerce Dec. 27, 2000) ("Final Determination"). Commerce determined that Kanzen was selling pipe fittings in the United States at less than fair value by a weighted-average dumping margin of 7.51%. Id. at 81,827.
 
 
 13
 On December 28, 2000, one day after the publication of the final determination, Kanzen filed its first request with Commerce for the correction of alleged ministerial errors. Kanzen claimed that the $42.00 credit expense reported for sixty-four of its United States sales was erroneous and argued that the error should be corrected pursuant to 19 C.F.R. § 351.224.[1] Kanzen discovered the alleged error "[a]fter reviewing the margin calculation program and Kanzen's home market and U.S. sales listings." (Appellant's Br. at 4). Kanzen argued that under our decision in NTN Bearing Corp. v. United States, 74 F.3d 1204 (Fed.Cir.1995), Commerce was required to correct inadvertent and obvious errors made by respondents.
 
 
 14
 Commerce denied the request on January 17, 2001, on the ground that errors made by respondents did not fall under the regulatory definition of "ministerial error," and distinguished our decision in NTN Bearing's on the ground that the alleged errors here were not brought to Commerce's attention before the final determination. (J.A. at 107-8). Kanzen repeated its request that Commerce correct the alleged errors on February 1, 2000. Commerce rejected this request on February 6, 2001, on the grounds that it had already determined that the alleged errors were not ministerial, and because pursuant to 19 C.F.R. § 351.224(c)(2), the request was untimely. (J.A. at 121).
 
 
 15
 Kanzen challenged Commerce's final determination in the Court of International Trade, urging that Commerce erred in refusing to correct the alleged ministerial errors. Kanzen also requested that the court supplement the administrative record with documents related to the alleged errors that were filed with Commerce after the final determination. On cross-motions for summary judgment on the administrative record, the court sustained Commerce's final determination in all respects and denied Kanzen's motion to supplement the administrative record. Alloy Piping Prods., 201 F.Supp.2d at 1269.
 
 
 16
 The court held that it would not supplement the record with materials submitted to Commerce after the final determination, "because [the materials] had no bearing on Commerce's findings and decisions in its Final Determination. If an error was committed, it will be `manifest from the record as submitted.'" Id. at 1280 (quoting NSK Ltd. v. United States, 788 F.Supp. 1228, 1229 (C.I.T.1992)).
 
 
 17
 The court then held that Commerce was not required by statute to correct the alleged errors in Kanzen's final submitted database. Although the relevant statute, 19 U.S.C. § 1673d(e), and regulation, 19 C.F.R. § 351.224(c), do not clarify whether the definition of "ministerial error" includes an error made by a respondent, "it is a reasonable application of the statute for Commerce to limit the correction of [ministerial errors] to those attributable to Commerce." Alloy Piping Prods., 201 F.Supp.2d at 1284.
 
 
 18
 Finally, the court noted that Commerce's long-held policy was to correct errors attributable to respondents when such errors were called to Commerce's attention before the issuance of the final determination. Id. at 1285 (citing Certain Fresh Cut Flowers from Colombia, 61 Fed. Reg. 42,833, 42,834 (Dep't Commerce Aug. 19, 1996)). In the present case, the court found that Kanzen did not call attention to the alleged errors in its United States sales database before the issuance of the final determination, and that Commerce's decision not to correct those errors was not an "abuse of discretion." Id.
 
 
 19
 Kanzen timely appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).
 
 DISCUSSION
 
 20
 The question presented here is whether Commerce erred in refusing to correct an alleged error in its final determination on the ground that the respondent, rather than Commerce, was the source of the error. We assume for purposes of this appeal that an error existed in the final determination.
 
 
 21
 "When reviewing anti-dumping determinations made by Commerce, this court applies anew the standard of review applied by the Court of International Trade in its review of the administrative record." Koyo Seiko Co., 258 F.3d at 1345-46 (internal citation omitted); see also Haselrig v. United States, 333 F.3d 1354, 1355 (Fed.Cir.2003). We therefore uphold Commerce's determination unless it is arbitrary and capricious or "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2000).
 
 
 22
 * First, the appellant urges that 19 U.S.C. § 1673d(e), entitled "Correction of ministerial errors," required Commerce to correct the error. That section provides:
 
 
 23
 The administering authority shall establish procedures for the correction of ministerial errors in final determinations within a reasonable time after the determinations are issued under this section. Such procedures shall ensure opportunity for interested parties to present their views regarding any such errors. As used in this subsection, the term "ministerial error" includes errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error which the administering authority considers ministerial.
 
 
 24
 19 U.S.C. § 1673d(e) (2000) (emphasis added). Commerce interpreted "ministerial errors" in the present case as not including errors made by respondents and refused to correct the alleged error in the database. The first issue then is whether Commerce correctly interpreted the statute.
 
 
 25
 Because the statute does not define "ministerial," we presume that the word has its ordinary, established meaning, for which we may consult dictionaries. Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1320 (Fed.Cir.2003). Subsection 1673d(e) of the statute was enacted in 1988. Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100-418, 102 Stat. 1107, 1209 (codified at 19 U.S.C. § 1673d(e) (2000)). The dictionary definitions available at that time define a ministerial act as one not involving discretion. Some of these definitions do not limit the meaning of "ministerial" to government acts. For example, the fourth edition of Black's Law Dictionary defined "ministerial act" as, "[o]ne which a person or board performs in a given state of facts in a prescribed manner in obedience to the mandate of legal authority without regard to or exercise of his or their own judgment upon the propriety of the act being done." Black's Law Dictionary 899 (5th ed. 1979) ("Black's") (emphasis added). Black's provided a definition of "ministerial" as "[t]hat which involves obedience to instructions, but demands no special discretion, judgment, or skill." Id. Webster's Third New International Dictionary provided a definition of "ministerial" as "of, relating to, or being an act that a person after ascertaining the existence of a specified state of facts performs in obedience to a mandate of legal authority without the exercise of personal judgment upon the propriety of the act and usu. without discretion in its performance." Webster's Third New International Dictionary 1439 (1971) ("Webster's") (emphasis added).
 
 
 26
 Other definitions, however, defined "ministerial" as exclusively relating to the government. For example, Webster's defined "ministerial" as "of, being, or having the characteristics of an act or duty belonging to the administration of the executive function in government and specifically prescribed by law as part of the official duties of an office." Id.
 
 
 27
 In some circumstances, multiple dictionary definitions create an ambiguity, such that we must defer to the agency's interpretation of the statute under the Chevron doctrine. See, e.g., Nat'l R.R. Passenger Corp. v. Boston & Me. Corp., 503 U.S. 407, 418-19, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992). Here, however, in context, it is clear that Congress intended to cover only an error committed by Commerce itself, and there is no ambiguity in the statute. The statute requires Commerce to establish "procedures for the correction of ministerial errors in final determinations." 19 U.S.C. § 1673d(e) (2000) (emphasis added). Because it is Commerce alone that produces the final determination, it is clear that Congress intended "ministerial errors" to mean those errors "belonging to the administration of the executive function in government." Webster's at 1439.
 
 
 28
 The legislative history supports this interpretation. The Report of the Committee on Ways and Means included commentary on the new subsection:
 
 
 29
 It has come to the Committee's attention that certain final determinations contain clerical and other errors which are not corrected, under current procedures, unless the parties to the proceedings resort to judicial review of the final determination. The result is expensive litigation that unnecessarily burdens the court system, in order to correct essentially unintended errors. Therefore, the Committee has adopted this provision to allow for the correction of ministerial errors in final determinations within a limited period after their issuance.
 
 
 30
 H.R. Rep. No. 100-40, at 144 (1987) (emphases added). This passage demonstrates that Congress provided for the correction of errors in the final determinations produced by Commerce.
 
 
 31
 Even if the statutory term were ambiguous, we would resort to the Chevron doctrine to resolve that ambiguity. Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Commerce has promulgated a regulation on the "procedures for the correction of ministerial errors." 19 C.F.R. § 351.224 (2002). The regulation provides, "[t]he Secretary will analyze any comments received and, if appropriate... correct any ministerial error by amending the final determination." Id. at § 351.224(e). While the regulation does not specify whether "ministerial errors" includes errors made by respondents, the preamble to the regulation makes clear that Commerce interprets the term as limited to government errors. "The provisions of § 351.224 ... only apply to ministerial errors ... and, hence, only to errors made by the Department." Rules and Regulations, Department of Commerce, International Trade Administration, 62 Fed. Reg. 27,296, 27,327 (May 19, 1997). The parties disagree as to whether a regulatory preamble is an agency determination entitled to Chevron deference, but we need not decide that question. In the very decision under review, Commerce has confirmed that interpretation, by determining that the errors made by Kanzen were not "ministerial," and, hence, Commerce was not required to correct them. (J.A. at 107-8.) Our decision in Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372 (Fed.Cir.2001), holds that such interpretations by Commerce in the course of antidumping proceedings are entitled to Chevron deference. Id. at 1380. Under the Chevron standard of review, Commerce's interpretation of "ministerial errors" as including only those errors made by the government would be a permissible construction of 19 U.S.C. § 1673d(e) and 19 C.F.R. § 351.224(e). In short, Commerce is not required by 19 U.S.C. § 1673d(e) or by 19 C.F.R. § 351.224(e) to correct errors made by respondents in anti-dumping proceedings.
 
 II
 
 32
 * This leads then to Kanzen's second argument — that Commerce's refusal to correct the error was arbitrary and capricious. The predicate for Kanzen's argument is our decision in NTN Bearing Corp. v. United States, 74 F.3d 1204 (Fed.Cir.1995). In that case the International Trade Administration ("ITA") released a preliminary determination that the respondent should be assessed an antidumping duty. Before the final calculations and final determination, based on its examination of the preliminary calculations, the respondent submitted a "timely response" requesting that ITA correct two clerical errors made by the respondent in its earlier submission to ITA, but ITA refused to correct the errors. Id. at 1205-06. We noted that "[i]n some instances, a tension may arise between finality and correct result." Id. at 1208. However, we held that "preliminary determinations are `preliminary' precisely because they are subject to change. Thus, the tension between finality and correctness simply did not exist at the time [the respondent] requested correction." Id. Therefore, because "NTN responded in a timely manner to the preliminary determination, pointing out ITA's clerical errors, as well as its own," ITA's refusal to correct NTN's errors while correcting its own was arbitrary and capricious. Id. at 1208, 1209.
 
 B
 
 33
 The government argues that there is no basis for an arbitrary and capricious argument here, because the antidumping statute limits the administrative record to filings that occur before the final determination. Therefore, according to the government, Kanzen's notice to Commerce of the alleged error, the parties' briefs filed with Commerce on the propriety of correcting the error, and Commerce's memoranda explaining its decision not to correct the error, are not even part of the record for review. This argument is simply untenable. The statute on which the government relies provides as follows:
 
 
 34
 For the purposes of this subsection, the record, unless otherwise stipulated by the parties, shall consist of —
 
 
 35
 (i) a copy of all information presented to or obtained by the Secretary, the administering authority, or the Commission during the course of the administrative proceeding, including all governmental memoranda pertaining to the case and the record of ex parte meetings required to be kept by section 1677f(a)(3) of this title; and
 
 
 36
 (ii) a copy of the determination, all transcripts or records of conferences or hearings, and all notices published in the Federal Register.
 
 
 37
 19 U.S.C. § 1516a(b)(2)(A) (2000). The notice of error and briefs Commerce received after the final determination were received "during the course of the administrative proceeding." Although Commerce had issued a final determination, the statute calls for further administrative procedures after the final determination. There must be "procedures for the correction of ministerial errors," which are required by 19 U.S.C. § 1673d. Moreover, Commerce's own regulations require the Secretary to "analyze any comments received and, if appropriate... correct any ministerial error by amending the final determination." 19 C.F.R. § 351.224(e) (2002). The decision whether to make such a correction is subject to judicial review. See 19 U.S.C. § 1516a(a)(3) (2000); see, e.g., NTN Bearing Corp., 74 F.3d at 1206-09. Hence, the "comments received" by Commerce regarding alleged ministerial errors must be part of the administrative record for review.
 
 C
 
 38
 The government argues alternatively that Commerce's refusal to correct Kanzen's error after the final determination was not arbitrary and capricious. The government argues that a respondent can easily check the accuracy of the data it submits to Commerce and notify Commerce of any errors it has made before the issuance of the final determination.[2] The regulations allow for only 30 days for Commerce to receive comments on ministerial errors and make any corrections to the final determination. See 19 C.F.R. § 351.224(e) (2002). Once Commerce has made an affirmative final determination, the ITC has only 45 days to make an injury determination. 19 U.S.C. § 1673d(b)(2)(B) (2000). The government argues that this expedited time-frame suggests that under no circumstances after a final determination should Commerce be required to correct an error made by a respondent.
 
 
 39
 We agree in large part, but not completely. Commerce is not required to correct a final determination reflecting an error made by a private party when that error is not apparent from Commerce's final calculations released pursuant to 19 C.F.R. § 351.224(b), or from the final determination itself. As we recognized in NTN Bearing, there is a strong interest in the finality of Commerce's decisions. 74 F.3d at 1208. NTN Bearing does not require correction of errors after a final determination. There the respondent notified the ITA of the errors in its submission before the release of the final determination and, hence, "the tension between finality and correctness simply did not exist at the time [the respondent] requested correction." Id.
 
 
 40
 However, in some instances, a respondent's error will be apparent from the face of Commerce's own final decision or from the calculations underlying that decision and released pursuant to 19 C.F.R. § 351.224(b). For example, in Koyo Seiko Co. v. United States, 746 F.Supp. 1108 (C.I.T.1990), the Court of International Trade found that a respondent's error was so obvious as to require correction by Commerce after the final determination, where "[t]he flawed computer tapes rendered both negative and positive dumping margins in excess of 16,000%." Id. at 1111 n. 4. The failure of Commerce to correct an error made by the respondent that was apparent or should have been apparent to Commerce would be arbitrary and capricious.[3] In fact, when an error is apparent (or should have been apparent) from the face of the calculation or from the final determination itself and goes uncorrected, that error, in effect, becomes a government error and, hence, a "ministerial" error, and the government is required to correct it. Of course, in such a circumstance, the respondent is required to exhaust its administrative remedies. Under the regulation, this means applying to Commerce to correct the error within five days of the release of the final calculations or, if an extension is granted, within five days after the publication of the final determination. 19 C.F.R. § 351.224(c)(2), (c)(4) (2002).
 
 D
 
 41
 In this case there is no allegation that the error was or should have been apparent to Commerce before the final determination. Although Kanzen asserts in its reply brief that the alleged error was "obvious and egregious from the record before Commerce" (Appellant's Reply Br. at 12), at oral argument, Kanzen admitted, "[w]e are not faulting Commerce for not finding the error and correcting it on its own." Furthermore, Kanzen argues in its brief that "given that there were some 401,120 separate pieces of information in Kanzen's U.S. sales database," it would have been exceedingly difficult for it to identify the alleged error "in 64 of the 10,028 credit expense fields." (Appellant's Reply Br. at 28.) If the alleged errors were difficult to identify by Kanzen, the party that created the database and submitted it to Commerce, it would be even more difficult for Commerce to identify the alleged errors without assistance from the party. We hold also that the alleged errors were not obvious from the final determination itself. Unlike in Koyo Seiko, where "[t]he flawed computer tapes rendered both negative and positive dumping margins in excess of 16,000%," 746 F.Supp. at 1111 n. 4, the dumping margin in this case was a mere 7.51%. Final Determination, 65 Fed. Reg. at 81,827.
 
 
 42
 Under such circumstances, where: (1) the error was made by the respondent; (2) no request to correct the error was made before the final determination; and (3) there was no showing that the error was apparent to Commerce (or should have been apparent) from the record or the final determination itself, Commerce was not required to correct the alleged error after issuing its final determination.
 
 CONCLUSION
 
 43
 For the foregoing reasons, the judgment of the United States Court of International Trade is
 
 
 44
 
 AFFIRMED.
 
 
 COSTS
 
 45
 No costs.
 
 
 
 Notes:
 
 
 [1]
 The regulation provides, in part, "[t]he Secretary will analyze any comments received and, if appropriate ... correct any ministerial error by amending the final determination." 19 C.F.R. § 351.224(e) (2002)
 
 
 [2]
 Here, Kanzen failed to alert Commerce of the error in its own submission before the publication of the final determination on December 27, 2000. Kanzen had such an opportunity in the period after submission of its data on August 15, 2000, and another opportunity, albeit a brief one, when Commerce made available the final calculations on December 20, 2000, which reflected the allegedly erroneous $42.00 entry for credit expenses
 
 
 [3]
 Indeed, counsel for the government conceded as much at oral argument:
 THE COURT: So there are some circumstances — there's no absolute rule here — there are some circumstances under which Commerce has to look at the data and say, "gee, that looks like an error," and it has to fix it, and if it doesn't fix it, then it's arbitrary and capricious?
 THE GOVERNMENT: That's correct, your honor, but there are no obvious errors. In this case the errors were not obvious.