**Slip Op. 03-79**

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                                    :
DUPONT TEIJIN FILMS USA, LP,                        :
MITSUBISHI POLYESTER FILM OF                        :
AMERICA, LLC, and                                   :
TORAY PLASTICS (AMERICA), INC.,                     :
                                                    :
             Plaintiffs,                            :
                                                    :
        v.                                          :
                                                    :    Consol. Court No. 02-00463
                                                    :
UNITED STATES,                                      :
                                                    :
             Defendant,                             :
                                                    :
        and                                         :
                                                    :
POLYPLEX CORPORATION LIMITED,                       :
                                                    :
             Defendant-Intervenor.                  :
                                                    :
_____             :

[ITA's antidumping duty determination remanded.]

Dated: July 9, 2003

Wilmer, Cutler & Pickering (John D. Greenwald, Ronald I. Meltzer, Jason E. Kearns and Omari S. Simmons) for plaintiffs.

Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Lucius B. Lau, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, (Paul Kovac), Scott D. McBride and David R. Mason, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

Coudert Brothers LLP (Kay C. Georgi and Mark P. Lunn) for defendant-intervenor.

## OPINION

**RESTANI, Judge:**

This matter is before the court on a motion for judgment upon the agency record pursuant to USCIT Rule 56.2 by Dupont Teijin Films USA, LP, Mitsubishi Polyester Film of America, LLC, and Toray Plastics (America), Inc. (collectively "Plaintiffs"), petitioners in the underlying antidumping duty ("AD") investigation. See Polyethylene Terephthalate Film, Sheet, and Strip From India, 67 Fed. Reg. 34,899 (Dep't Commerce May 16, 2002) (final) [hereinafter "Final Determination"]. In its Final Determination, the Department of Commerce ("Commerce") found that polyethylene terephthalate film, sheet, and strip ("PET film") from India are being sold, or are likely to be sold, in the United States at less than fair value ("LTFV"). Id. at 34,899. Plaintiffs challenge only one aspect of the Final Determination: Commerce's decision to exclude from the antidumping duty order PET film produced in India by defendant-intervenor Polyplex Corporation Limited ("Polyplex").

## JURISDICTION & STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000). The court will uphold Commerce's determination in an antidumping duty investigation unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2000).

## FACTUAL & PROCEDURAL BACKGROUND

On May 17, 2001, Plaintiffs, domestic producers of PET film, simultaneously filed an antidumping duty petition against imports of PET film from India and Taiwan and a countervailing duty petition against PET film from India. Commerce published notice of its

initiation of both investigations on June 13, 2001.[1]  See Polyethylene Terephthalate Film, Sheet,

and Strip (PET Film) from India and Taiwan, 66 Fed. Reg. 31,888 (Dep't Commerce June 13,

2001) (initiation); Polyethylene Terephthalate Film, Sheet, and Strip (PET film) from India, 66

Fed. Reg. 31,892 (Dep't Commerce June 13, 2001) (initiation).  Commerce preliminarily

determined that PET film from India is being, or is likely to be, sold in the United States at

LTFV.  Polyethylene Terephthalate Film, Sheet, and Strip from India, 66 Fed. Reg. 65,893,

65,894 (Dep't Commerce Dec. 21, 2001) (prelim.) [hereinafter "Preliminary Determination"].

In the Preliminary Determination, Commerce calculated the export price,[2] or, where

appropriate, the constructed export price[3] for Polyplex's exports in accordance with section

772(a) of the Tariff Act of 1930, 19 U.S.C. § 1677a.  See id. at 65,895–96.  Commerce then

increased Polyplex's export price (sometimes referred to as "U.S. price") "by the amount of the

---

[1] The period of investigation was April 1, 2000, through March 31, 2001.

[2] The statute defines "export price" as:
the price at which the subject merchandise is first sold (or agreed to be sold) before
the date of importation by the producer or exporter of the subject merchandise
outside of the United States to an unaffiliated purchaser in the United States or to an
unaffiliated purchaser for exportation to the United States, as adjusted . . . .
19 U.S.C. § 1677a(a) (2000).  In other words, Commerce uses export price where foreign
producers sell merchandise directly to unaffiliated purchasers in the United States.  See Prelim.
Determ., 66 Fed. Reg. at 65,895.

[3] "Constructed export price" is
the price at which the subject merchandise is first sold (or agreed to be sold) in the
United States before or after the date of importation by or for the account of the
producer or exporter of such merchandise or by a seller affiliated with the producer
or exporter, to a purchaser not affiliated with the producer or exporter, as
adjusted . . . .
19 U.S.C. § 1677a(b).  Commerce thus calculates constructed export price when sales to
unaffiliated purchasers take place after importation into the United States.  See Prelim. Determ.,
66 Fed. Reg. at 65,896.

export subsidy found in the companion countervailing duty investigation on PET film from

India."[4]  Id. at 65,896 (emphasis added).  This adjustment caused Polyplex's estimated dumping

margin[5] to fall below statutory de minimis levels.  Id. at 65,898 (reporting Polyplex's weighted-

average dumping margin,[6] as adjusted, as 1.38 percent); see 19 U.S.C. § 1673b(b)(3) (2000)

(requiring Commerce to "disregard any weighted average dumping margin that is . . . less than 2

percent ad valorem or the equivalent specific rate for the subject merchandise.").  Commerce

therefore preliminarily determined to exclude Polyplex from the antidumping duty order.  See

Prelim. Determ., 66 Fed. Reg. at 65,898.  After publishing its Preliminary Determination,

Commerce issued and received an additional supplemental questionnaire for respondent

Polyplex, conducted a verification of respondents' questionnaire responses, reviewed case briefs

and rebuttal briefs, and held a public hearing.  Final Determ., 67 Fed. Reg. at 34,899.

In the Final Determination, Commerce again found that PET film from India is being

sold, or is likely to be sold, in the United States at LTFV, but the Department continued to

exclude Polyplex from the affirmative determination.  Id.  Commerce had calculated a weighted-

---

[4] The basic economic theory behind these types of adjustments "is that in parallel AD and CVD investigations, if the Department finds that a respondent received the benefits of an export subsidy program, it is presumed the subsidy contributed to lower-priced sales of subject merchandise in the United States market by the amount of any such export subsidy."  Issues & Decision Mem. for the Final Determ. in the Antidumping Duty Investigation of PET film from India at cmt. 1, 67 ITA Doc. 34,899, summarized at 67 Fed. Reg. 34,899 (May 16, 2002) [hereinafter "Issues and Decision Memorandum"].  The offset is designed to prevent the "double application" of duties when the subsidies and dumping are related.  Id.

[5] A "dumping margin" is "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise."  19 U.S.C. § 1677(35)(A) (2000).

[6] A "weighted average dumping margin" is "the percentage determined by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer."  Id. § 1677(35)(B).

average dumping margin of 10.34 percent for Polyplex, but it "adjusted the antidumping duty cash deposits[7] for the export subsidies found in the companion countervailing investigation rather than adjusting net U.S. price." Id. at 34,900–01 & n.2 (citing Issues & Decision Mem. at cmt. 2) (emphasis added). The domestic industry, petitioners below and Plaintiffs here, had contested the methodology used in the Preliminary Determination, arguing that the statute only authorizes Commerce to increase a producer's U.S. price by the amount of countervailing duties "actually 'imposed' (i.e., assessed) on the subject merchandise" rather than by the amount of estimated countervailable export subsidies. Issues & Decision Mem. at cmt. 1 (quoting Petitioners' Case Br. at 3). Commerce agreed that its "longstanding practice in an investigation is to offset the AD cash deposit rate by the export subsidy cash deposit rate" rather than adjusting the dumping margin calculation.[8] Id. Nonetheless, Commerce excluded Polyplex from the antidumping duty order, explaining that "[i]f the Department's calculations in an investigation result in a zero cash deposit rate, then in reality, there exists no dumping upon which an affirmative determination could be based as to that particular respondent."[9] Final Determ., 67 Fed. Reg. at 34,901; see

---

[7] After Commerce makes an affirmative final determination that subject merchandise is being sold at LTFV, it orders the producers or exporters to pay cash deposits for estimated antidumping duties on future entries, which are "based on the estimated weighted average dumping margin." Id. § 1673d(c)(1)(B) (2000).

[8] This practice, according to Commerce, "is a result of the practical administrative difficulties in applying the results of an ongoing CVD investigation to calculations in an ongoing AD investigation." Issues & Decision Mem. at cmt. 1.

[9] The Final Determination and accompanying Issues and Decision Memorandum both discuss and explain the methodology used to offset Polyplex's figures for the export subsidies as an adjustment to the cash deposit rate rather than U.S. price in accordance with longstanding Department practice. Both the Final Determination and the antidumping duty order, however, contain a chart with the manufacturers/exporters of PET film and their corresponding dumping

(continued...)

Antidumping Duty Order, 67 Fed. Reg. at 44,176 (excluding Polyplex).  This action followed.

## DISCUSSION

The crux of Plaintiffs' argument is that Polyplex must be included in the antidumping duty order because it has a dumping margin of 10.34 percent, despite its cash deposit rate of zero. Plaintiffs argue that the statute, legislative history, agency regulations, and the Statement of Administrative Action ("SAA") all support their view that an exclusion from an antidumping duty order is only allowed if the producer has a de minimis dumping margin.  Commerce argues that the statute is silent or ambiguous on this issue, its interpretation of the statute is reasonable, and that Commerce's decision to exclude Polyplex from the antidumping duty order is entitled to Chevron deference.  See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–43 (1984) (holding that if a statute is silent or ambiguous on a specific issue, courts must defer to the administrating agency's permissible construction of it).

The Department's construction of the antidumping statute is a question of law, so the court must first "determine whether Congress's purpose and intent on the question at issue is judicially ascertainable." Timex V.I. v. United States, 157 F.3d 879, 881 (Fed. Cir. 1998).  The

---

[9](...continued)

margins.  Next to Polyplex's name, rather than listing the calculated dumping margin of 10.34 percent, five asterisks appear with a footnote explaining that Polyplex was excluded "because the rate for Polyplex is zero after adjusting the dumping margin for the export subsidies in the companion countervailing duty order." Notice of Amended Final Antidumping Duty Determination of Sales at Less Than Fair Value and Antidumping Duty Order, 67 Fed. Reg. 44,175, 44,176 (Dep't Commerce July 1, 2002) (emphasis added) [hereinafter "Antidumping Duty Order"].  While this footnoted explanation directly conflicts with the stated reasoning in the Final Determination and the detailed discussion on this point in the Issues and Decision Memorandum, it is clear from the record as a whole that Commerce adjusted the cash deposit rate, not Polyplex's export price or the dumping margin, in excluding Polyplex from the antidumping duty order.  Commerce conceded this point at oral argument in response to the court's questions.

court looks at the plain language of the statute, legislative history, and the canons of statutory construction in ascertaining the intent of Congress.  See id. at 881–82; Dunn v. Commodity Futures Trading Comm'n, 519 U.S. 465, 470–79 (1997).  "The expressed will or intent of Congress on a specific issue is dispositive."  Ilva Lamiere E Tubi S.R.L. v. United States, 196 F. Supp. 2d 1347, 1349 (Ct. Int'l Trade 2002) (citing Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 233–37 (1986)).  Only if the court concludes that the statute is vague or silent on an issue should the court reach the issue of Chevron deference.  See Bd. of Governors Fed. Reserve Sys. v. Dimension Fin. Corp., 474 U.S. 361, 368 (1986); Timex, 157 F.3d at 881–82. Under Chevron, the court will uphold Commerce's interpretation of the antidumping laws if such an interpretation is reasonable given the express terms of the provisions at issue, the objectives of those provisions, and the objectives of the antidumping scheme as a whole.  See Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1379–80 (Fed. Cir. 2001) (affording Chevron deference to Commerce's interpretations of ambiguous statutory terms articulated in the course of an antidumping determination); Windmill Int'l Pte. v. United States, 193 F. Supp. 2d 1303, 1305–06 (Ct. Int'l Trade 2002) (citing Mitsubishi Heavy Indus. v. United States, 22 CIT 541, 545, 15 F. Supp. 2d 807, 813 (1998)).

In the present case, the law is clear that producers with dumping margins over two percent must be included in an affirmative final determination of sales at less than fair value. Under 19 U.S.C. § 1673d, Commerce engages in a two-step process in making an antidumping determination in an initial investigation.  First, Commerce must decide whether the subject merchandise is being, or is likely to be, sold in the United States at LTFV.  19 U.S.C. § 1673d(a)(1).  To make this determination, Commerce compares the normal value of the

merchandise in the home market to the export price of the same merchandise. If the normal value exceeds the export price, the merchandise is being sold at LTFV and the producer is "dumping." See id. § 1677(34) (defining "dumping" as "the sale or likely sale of goods at less than fair value"). Commerce is instructed to "disregard any weighted average dumping margin that is de minimis." Id. § 1673d(a)(4). A de minimis margin is one that is "less than 2 percent ad valorem or the equivalent specific rate for the subject merchandise." Id. § 1673b(b)(3). Thus, producers with de minimis dumping margins must be excluded from an antidumping duty order. See id. § 1673d(a)(4); 19 C.F.R. § 351.204(e)(1) (explaining that a producer with a de minimis dumping margin will be excluded from an affirmative final determination); Uruguay Round Agreements Act, SAA, H.R. Doc. No. 103-316 at 844 (1994), reprinted in 1994 U.S.C.C.A.N. 4040 ("Exporters or producers with de minimis margins will be excluded from any affirmative determination.").

If Commerce makes an affirmative finding that imports are being sold at LTFV, it must calculate the estimated weighted average dumping margin for each individually-investigated, determine the estimated "all-others rate" for exporters and producers not individually investigated, and order the producers or exporters to post an "appropriate" cash deposit or bond, which is "based on the estimated weighted average dumping margin." 19 U.S.C. § 1673d(c)(1)(B); see Auto Telecom Co. v. United States, 15 CIT 231, 233, 765 F. Supp. 1094, 1097 (1991) (emphasizing the two distinct inquires in (1) making a dumping determination and (2) ordering a cash deposit rate).[10] After Commerce makes its antidumping determination, if the

---

[10] The limits of Commerce's discretion in setting cash deposit rates is not at issue here. Plaintiffs do not challenge the zero cash deposit rate. They merely seek to keep Polyplex subject

(continued...)

United States International Trade Commission makes an affirmative finding of material injury to the domestic industry by reason of dumped imports, Commerce must issue an antidumping duty order. See 19 U.S.C. §§ 1673d(c)(2) & 1673e. The AD order is ministerial in nature, "the first step in the mandatory assessment of antidumping duty." Royal Business Machines, Inc. v. United States, 1 CIT 80, 86, 507 F. Supp. 1007, 1012–13 (1980).

As discussed, Commerce's dumping margin determination is distinct from its later order of cash deposits for subject entries. In this determination, however, Commerce collapsed these two inquiries when it improperly excluded Polyplex based on a zero cash deposit rate when its dumping margin was greater than de minimis. There is no statutory authority to exclude an exporter because its cash deposit rate, but not its dumping margin, is zero. See 19 U.S.C. § 1673d. Therefore, Commerce's decision to exclude Polyplex from the AD order on that basis is not in accordance with law.

The antidumping statute requires the Department make a final determination of whether the subject merchandise is being sold at LTFV and to "disregard" producers with de minimis dumping margins. Commerce cannot disregard a producer based only on a zero cash deposit rate. Upon remand, Commerce must calculate Polyplex's dumping margin after making the adjustments to export price required by 19 U.S.C. § 1677a and Commerce's reasonable

---

[10](...continued)
to the discipline of an antidumping duty order, which may require future periodic reviews and ultimately the assessment of duties.

interpretations thereof.[11]  If Commerce continues to calculate a dumping margin of 10.34 percent

for Polyplex, Polyplex must be subject to the antidumping duty order, whether or not it is given a

cash deposit rate of zero because of <u>expected</u> offsetting countervailing duties.

## CONCLUSION

Accordingly, Plaintiffs' motion for judgment on the agency record is granted and the

<u>Final Determination</u> is remanded for further consideration consistent with the court's opinion.

_____<br>Jane A. Restani<br>Judge

DATED:  New York, New York

This 9th of July, 2003.

---

[11] At oral argument on March 27, 2003, the court focused on the applicability of 19 U.S.C. § 1677a(c)(1)(C), which requires Commerce to increase the price used to establish export price by "the amount of any <u>countervailing duty imposed</u> on the <u>subject merchandise</u> . . . to offset an export subsidy," and the meaning of the emphasized terms.  The parties agreed that the provision applies during AD investigations, but disputed whether the provision allows Commerce to adjust Polyplex's U.S. price here.  Plaintiffs maintained that the statute only allows Commerce to increase U.S. price for CVD duties actually assessed so as to avoid double liability.  Commerce argued that the statute was silent or ambiguous on the question of whether an offset was allowed for countervailable subsidies found in a companion CVD investigation but not yet finally assessed and, therefore, that its interpretation allowing the offset would be entitled to deference.  The court ordered additional briefing by the parties on this issue but has determined that, because Commerce did not apply this provision in its <u>Final Determination</u> to offset for the export subsidies, but instead adjusted the cash deposit rates, the issue is not ripe for review.  On remand, Commerce may set forth its new interpretation of the disputed statutory terms.  Plaintiffs will have an opportunity to voice their views on the administrative record, and Commerce will have to consider their arguments and address them in its redetermination.  Commerce must follow the statute and provide a reasoned analysis for the ultimate methodology it adopts.