**Slip Op. 04-70**

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| | : | |
| DUPONT TEIJIN FILMS USA, LP, | : | |
| MITSUBISHI POLYESTER FILM OF | : | |
| AMERICA, LLC, and | : | |
| TORAY PLASTICS (AMERICA), INC., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | Consol. Court No. 02-00463 |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| POLYPLEX CORPORATION LIMITED, | : | |
| | : | |
| Defendant-Intervenor. | : | |
| | : | |

[ITA's antidumping duty second remand determination sustained.]

Dated:  June 18, 2004

    Wilmer Cutler Pickering Hale and Dorr LLP (John D. Greenwald, Ronald I. Meltzer, and Lynn M. Fischer Fox) for plaintiffs.

    Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Paul D. Kovac), Scott D. McBride, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

    Coudert Brothers LLP (Kay C. Georgi and Mark P. Lunn) for defendant-intervenor.

**OPINION**

**RESTANI, Chief Judge:** This antidumping case is once again before the court following a second remand to the United States Department of Commerce, International Trade Administration ("Commerce," "the Department," or "ITA") to more fully consider its determination with respect to Defendant-Intervenor Polyplex Corporation Limited ("Polyplex"). Polyplex is an Indian producer of polyethylene terephthalate film, sheet, and strip ("PET film"), which the Department found in its final antidumping duty ("AD") determination to be sold, or likely to be sold, in the United States at less than fair value ("LTFV"). Dupont Teijin Films USA, LP v. United States, 273 F. Supp. 2d 1347, 1348 (Ct. Int'l Trade 2003) ("Dupont Teijin I"); see Dupont Teijin Films USA, LP v. United States, No. 02-00463, Slip Op. 03-157 (Ct. Int'l Trade Dec. 4, 2003) ("Dupont Teijin II") (denying Plaintiffs' motion for preliminary injunction after the Department determined to include Polyplex in the AD order upon first remand). The sole issue is whether, in issuing an amended AD determination simultaneously with the CVD order on PET film from India, the Department was required to recalculate Polyplex's dumping margin to account for the countervailing duties that were thus "imposed" under Commerce's new interpretation of the applicable statute, 19 U.S.C. § 1677a(c)(1)(C), and thus, to exclude Polyplex from the AD order. See Dupont Teijin Films USA, LP v. United States, 297 F. Supp. 2d 1367, 1374 (Ct. Int'l Trade 2003) ("Dupont Teijin III"). Absent such an amendment, Polyplex's dumping margin of 10.34 percent would mandate its inclusion in the antidumping duty order. See Dupont Teijin I, 273 F. Supp. 2d at 1353. In its Final Results of Redetermination Pursuant to Court Remand (Dep't Commerce Mar. 3, 2004) [hereinafter Second Remand Determination], the Department more fully explained its new policy in determining respondents' U.S. prices in

simultaneous AD and CVD investigations, but concluded that it was not authorized to amend its

original determination in order to recalculate Polyplex's dumping margin.  On appeal, Polyplex

claims that such an amendment was required, or at least permitted, under the statute, and that the

Department failed to comply with the court's instructions upon second remand.  For the reasons

that follow, the Second Remand Determination is sustained.

### JURISDICTION & STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000).  The court will uphold

Commerce's Second Remand Determination if it is supported "by substantial evidence on the

record" and is otherwise "in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(I) (2000).

### BACKGROUND

In its final AD determination, the Department determined that Polyplex dumped PET film

in the U.S. market at a margin of 10.34 percent, but excluded Polyplex from the AD order on the

ground that, after adjusting Polyplex's cash deposit rate to account for the countervailable export

subsidies found in a concurrent CVD investigation, "there exists no dumping upon which an

affirmative determination could be based."  Polyethylene Terephthalate Film, Sheet, and Strip

from India, 67 Fed. Reg. 34,899, 34,901 (Dep't Commerce May 16, 2002) [hereinafer Final

Determination].  In Dupont Teijin I, the court held that this decision was not in accordance with

law and remanded it to Commerce with instructions to "calculate Polyplex's dumping margin

after making the adjustments to export price required by 19 U.S.C. § 1677a[1] and Commerce's

---

[1]  This provision requires the Department to increase the price used to establish a foreign producer's export or constructed export price by "the amount of any countervailing duty imposed on the subject merchandise under Part I of this subtitle to offset an export subsidy."  19 U.S.C. § 1677a(c)(1)(C).

reasonable interpretations thereof." 273 F. Supp. at 1352. The court went on to instruct that, "[i]f Commerce continues to calculate a dumping margin of 10.34 percent for Polyplex, Polyplex must be subject to the antidumping duty order, whether or not it is given a cash deposit rate of zero because of expected offsetting countervailing duties."[2] Id. at 1352–53.

In its Final Results of Redetermination Pursuant to Court Remand (Dep't Commerce Aug. 11, 2003) [hereinafter Remand Determination], the Department explained that it "now interprets 19 U.S.C. § 1677a(c)(1)(C) as requiring an increase in the respondent's export or constructed export price by the amount of countervailing duties imposed pursuant to a countervailing duty order."[3] Remand Determ. at 8. As applied here, Polyplex's exports were not subject to a CVD order at the time Commerce issued the final antidumping determination. Id. Therefore, Commerce determined to include Polyplex in the AD order, even though the Department issued a revised final determination along with the AD order on PET film on the same day that it issued the CVD order on the subject merchandise. Dupont Teijin III, 297 F. Supp. 2d at 1374.

In Dupont Teijin III, the court sustained the Department's Remand Determination in part,

---

[2] The court noted that:

The limits of Commerce's discretion in setting cash deposit rates is not at issue here. Plaintiffs do not challenge the zero cash deposit rate. They merely seek to keep Polyplex subject to the discipline of an antidumping duty order, which may require future periodic reviews and ultimately the assessment of duties.

Dupont Teijin I, 273 F. Supp. 2d at 1352 n.10.

[3] In other words, "Commerce considers countervailing duties to be imposed upon the issuance of a countervailing duty order." Remand Determ. at 4 cmt. 1.

finding that its interpretation of § 1677a(c)(1)(C) was reasonable and entitled to deference.[4]  Id.

at 1373.  Nevertheless, the court found that the Department had failed to adequately address

several concerns raised by Polyplex in challenging the Department's application of its new

interpretation of "imposed" when calculating Polyplex's dumping margin.  The court also found

that the Department had failed to fully consider the broader implications of its general

application of the new interpretation, which may unfairly skew proceedings in petitioners' favor.[5]

See id. at 1374.  Thus, the court remanded the AD determination on PET film from India to

Commerce for a second time with instructions to "explain how it will fairly and consistently

apply its interpretation of 'imposed' when a final determination or an amended final

determination issues on the same day as a countervailing duty order on the subject

---

[4]  After reviewing the statutory framework, the court concluded that it was reasonable for Commerce to consider countervailing duties to be "imposed on the subject merchandise under part I of this subtitle" upon the issuance of a countervailing duty order, because part I governs CVD investigations which will culminate in the issuance of a CVD order only upon affirmative determinations of both Commerce and the International Trade Commission ("ITC").  Dupont Teijin III, 297 F. Supp. 2d at 1372–73.  Further, there is no certainty as to CVD duties until all opportunities for amendment have expired and the CVD order actually issues.

[5]  In Dupont Teijin III, Polyplex strongly objected to its inclusion in the AD order. Polyplex argued that countervailing duties were in fact "imposed" upon its entries, even under the Department's new interpretation of § 1677a(c)(1)(C), because the CVD order was issued on the same day as the amended final AD determination and AD order.  Thus, Polyplex claimed that Commerce should have made the upwards adjustment to its U.S. price and excluded it from the AD order on PET film from India.  297 F. Supp. 2d at 1373.
    Polyplex also disputed the long-term impact of the Department's new interpretation, arguing that, in similar cases where export subsidies contribute to a respondent's lower-priced sales of subject merchandise in the U.S. market, the domestic industry would be able to effectively control whether a particular respondent would be included in an AD order by filing an extension or alignment request in the companion CVD investigation.  Id. at 1373–74.  As the court noted in Dupont Teijin III, Commerce may extend a CVD determination on the grounds that it is extraordinarily complicated under 19 U.S.C. § 1671b(c)(1), and petitioners, by filing an alignment request, can ensure that final AD and CVD determinations issue simultaneously under 19 U.S.C. § 1671d(a)(1) and Commerce's regulations.  Id. at 1374.

merchandise."[6] Id. The court also instructed the Department to analyze whether certain procedural extensions that would delay the issuance of a CVD order or align it with the issuance of the AD order, devices available only to the Department and the domestic industry that would effectively prevent countervailing duties from being "imposed" prior to issuance of the AD order, would unfairly allow petitioners to dictate the outcome of concurrent antidumping and countervailing duty investigations when, as here, export subsidies are presumed to cause the respondents' lower-priced sales of subject merchandise in the U.S. market.[7] Id. at 1374, 1368 n.1 (explaining the economic theory behind § 1677a's price adjustment provision). The court noted that Commerce should "seek to restore the parties," to the extent possible, "to the position they would have been had they been able to act on the Department's new interpretation of 'imposed,' and the court's determination in this matter, prior to the issuance of the Amended Final Determination." Id. at 1374–75.

Commerce issued its Second Remand Determination on March 3, 2004. As ordered by the court, the Department first addressed Polyplex's concern that domestic petitioners would be

---

[6] The court explained that "[g]iven Commerce's fairly routine procedure of amending final antidumping duty determinations, it is not a sufficient answer to say that the margin calculated in the Final Determination was binding." Id. at 1374. Thus, the court stated that "Commerce must provide a reasonable explanation for its failure to take the countervailable subsidies into consideration when it re-promulgated all of the dumping margins, including that of Polyplex, in the Amended Final Determination and antidumping duty order that issued on the same day as the countervailing duty order." Id. n.10.

[7] The court noted that absent the domestic industry's request to align the final countervailing duty determination with the final antidumping duty determination, the countervailing duty order would have issued before the final determination in the antidumping investigation. Thus, absent petitioners' alignment request here, countervailing duties would have been "imposed" on the subject merchandise at the time of the original final determination in the antidumping investigation, and Polyplex would have been excluded from the antidumping duty order. Id.

able to dictate the outcome of concurrent AD/CVD investigations by filing an extension or alignment request in the CVD investigation. Second Remand Determ. at 5–6; see supra n.5 (explaining statutory extension and alignment of CVD proceedings). As a preliminary matter, Commerce explained that it is required by statute to align a CVD investigation with a companion AD investigation if the petitioner makes such a request, as happened here. Second Remand Determ. at 5. The Department then noted that "even if the alignment provision were discretionary, the record in this proceeding does not support the conclusion that the petitioners manipulated or controlled the results of the AD determination by requesting alignment of the CVD determination," because the alignment request was filed before either the CVD or the AD preliminary determination issued. Id. Further, Commerce pointed out that "Polyplex's manipulation concerns spring from Commerce's interpretation of the term 'imposed' in 19 U.S.C. § 1677a(c)(1)(C), an interpretation that was not known to the petitioners at the time they filed their request for alignment." Id. As a result, Commerce found the petitioners here did not manipulate Polyplex's AD margin by requesting alignment of the investigations. Id. at 5–6. Regarding the extension of proceedings on the ground of extraordinary complication, the Department noted that this is discretionary, so that it can assess such requests on a case-by-case basis. Id. at 13.

Commerce next addressed the issue of "how it will fairly and consistently apply its interpretation of 'imposed' when a final determination or an amended final determination issues on the same day as a countervailing duty order on the subject merchandise." Dupont Teijin III, 297 F. Supp. 2d at 1374. Commerce explained that its final determinations are based solely on the information on the record at the time of the determination. Second Remand Determ. at 6.

While Commerce stated that it "likely" will adjust U.S. prices if an AD determination issues on

the same day as a CVD order, the Department stressed that "these are not the facts in this

proceeding." Id. The CVD order here was published after the final AD determination, and "any

information received by Commerce after the particular determination at issue is not part of the

reviewable record." Id. (quoting Alloy Piping Product, Inc. v. United States, 201 F. Supp. 2d

1267, 1280 (Ct. Int'l Trade 2002)). As a result, Commerce explained that it should not have, and

in fact could not have, considered the post-Final Determination CVD order in calculating

Polyplex's U.S. price. See id.

Although Commerce admitted that there are limited circumstances under which it may

amend final AD determinations, such amendments are limited to correcting "unintentional errors

that occurred while operating upon record information before it when it issued the

determinations."[8] Id. Thus, Commerce maintained that, despite its amendment of the Final

---

[8] By statute, Commerce is required to "establish procedures for the correction of ministerial errors in final determinations." 19 U.S.C. § 1673d(e). Ministerial errors include "errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error which [Commerce] considers ministerial." Id. Commerce's regulations provide that it will "correct any ministerial error by amending the final determination or final results of review." 19 C.F.R. § 351.224(e).

Commerce explained that, while it is aware of two other circumstances under which it will issue an amended final determination, those circumstances do not exist in this case. Second Remand Determ. at 7. The first situation is where Commerce must publish an amended final determination following a "Timken Notice," which results from an express granting of relief by the court. Id. (citing Timken Co. v. United States, 893 F.2d 337 (Fed. Cir. 1990); 28 U.S.C. § 2643(c) (2000)). The second circumstance arises when the merchandise found by Commerce to be sold at less than fair value differs in some respects from the merchandise found by the ITC to be causing material injury to the domestic industry. Id. In such a situation, Commerce is required to modify its calculations in the AD order to reflect the findings of the ITC, because an AD order can only be issued against merchandise that was both found to be dumped and found to be injuring the domestic industry. Id. (discussing Badger-Powhatan v. United States, 10 CIT

(continued...)

Determination here to correct a ministerial error in the calculation of another respondent's

dumping margin, it was not authorized to revise its margin calculation for Polyplex because there

were no "errors" to correct. Id. at 6–7. The Department noted that this court has held that the

ministerial error provisions do "not give the agency authority to upset final decisions where no

errors have occurred." Id. at 6 (quoting Badger-Powhatan, 10 CIT at 245, 633 F. Supp. at 1369).

As a result, "if an amended final AD determination is issued on the same day as a CVD order on

the same merchandise, Commerce cannot rely upon the ministerial error provision to reflect the

duties imposed by a CVD order in its amended final AD determination." Id. at 7. Thus,

Commerce concluded that, because countervailing duties had not been imposed at the time of the

Final Determination, it did not err in failing to increase Polyplex's U.S. prices in the AD

determination. Id.

The Department next addressed the court's instructions to restore the parties to the

position they would have been had they been aware of the new interpretation of "imposed"

before the issuance of the Amended Final Determination. Commerce reiterated that it was

required to align the CVD investigation with the AD duty investigation under § 1671d(a)(1), and

that it was not permitted to amend its final AD determination to adjust Polyplex's export prices

under the ministerial error provision. Id. at 9. "Thus, it is Commerce's position, given the

specific restrictions imposed by the statute, that the parties would be in the same position had

---

[8](...continued)
241, 633 F. Supp. 1364 (1986)). Commerce stressed that, with this type of revision to a
respondent's AD margin, the record is closed for the purposes of accepting new information, but
that Commerce must revise the scope of the AD order, and thus the final AD margin, to
correspond with the scope of the ITC's affirmative material injury finding. Id. at 7–8.
Commerce maintained that neither of these circumstances is present in this case, and the court
agrees.

they been able to act on Commerce's new interpretation of 'imposed,' and the court's determination in this matter." Id. After addressing the parties' comments to the draft second remand results, Commerce concluded that, since countervailing duties are not "imposed" until a CVD order has been issued, Polyplex must be included in the AD order, "given the statutory restraints and the Court's initial ruling on this matter." Id. at 19. This action followed.

**DISCUSSION**

As noted above, in Dupont Teijin III, the court upheld Commerce's interpretation of "imposed" in the context of an AD investigation to mean the issuance of a countervailing duty order. See 19 U.S.C. § 1677a(c)(1)(C) (requiring Commerce to adjust respondent's U.S. price by "the amount of any countervailing duty imposed on the subject merchandise under part I of this subtitle to offset an export subsidy"). On appeal, Polyplex claims that the Department failed to comply with the court's instructions regarding the application of the new interpretation. Polyplex asks the court to reverse and remand this action to the Department once again with instructions to make an upwards adjustment to Polyplex's U.S. price under 19 U.S.C. § 1677a(c)(1)(C), because countervailing duties were imposed on Polyplex's imports on the same date that the Department issued its Amended Final Determination and AD order. According to Polyplex, Commerce was required to amend its Final Determination and recalculate Polyplex's dumping margin since the AD and CVD orders issued on the same day. Each of these issues are addressed below.

**A.      Whether the Department Has Failed to Fully Address Polyplex's Concerns that Petitioners Can Manipulate the Results of an AD Investigation By Filing Procedural Extension Requests in the CVD Investigation**

Polyplex claims that the Department has failed to adequately address its manipulation concerns. Polyplex asserts that "the Department's interpretation of the statute gives the

petitioners an unfair advantage . . . to control the outcome of concurrent CVD/AD investigations." Mem. of Law of Def.-Intervenor Polyplex Corp. Ltd. Opp. Dep't Commerce's Second Redeterm. on Remand ("Polyplex Br.") at 9. Polyplex suggests that, to comply with the court's instructions in Dupont Teijin III, the Department needed to explain why it reads the statute in a manner "that converts a[] [petitioner's] extension request into a make-or-break margin adjustment" when "there is a viable reasonable alternative reading of the same statute" that requires—or, at a minimum, authorizes—Commerce to make an adjustment to a respondent's U.S. price where, as here, the AD final determination is amended and the AD order issues on or after the date the CVD order is issued. Id. at 5–6.

Responding to the Department's explanation in its Second Remand Determination that alignment of concurrent CVD and AD investigations is mandatory if petitioners request it under 19 U.S.C. § 1671d(a)(1), Polyplex states that "the fact that an extension must be granted does not mean that the Department is prohibited from making a § 1677a(c)(1)(C) adjustment in co-extended cases."[9] Id. at 6. Because the Department has interpreted § 1677a(c)(1)(C) to require a CVD order to be in place prior to the issuance of the AD final determination, Polyplex maintains that "the adjustment to U.S. price for export subsidies is made a nullity in most, if not all, companion AD/CVD investigations. This could not be the intent of Congress in drafting the statute." Id. at 8.

---

[9] Polyplex asserts that, because countervailing duties were imposed on the same day that the amended final determination and AD order issued, an adjustment should have been made under Badger-Powhatan and Borlem S.A. – Empreedimentos Industriais v. United States, 13 CIT 535, 718 F. Supp. 41 (1989), aff'd, 913 F.2d 933 (Fed. Cir. 1990). See infra Part B (discussing whether an adjustment to Polyplex's export price was required).

The court finds that Commerce did comply with the court's remand order to analyze the risks of petitioner manipulation in simultaneous AD and CVD investigations. As the Department explained in the Second Remand Determination, its extension of proceedings based on extraordinary complication is discretionary, so that it can analyze the risks of manipulation in such instances on a case-by-case basis. Alignment of the issuance of the orders in simultaneously-filed AD and CVD investigations, however, is required by 19 U.S.C. § 1671d(a)(1) upon a petitioner's request. Thus, alignment is a statutory right explicitly granted to the domestic industry by Congress. As Commerce pointed out in its determination upon remand, there are legitimate reasons for petitioners to request the alignment of AD and CVD proceedings, such as a desire to simultaneously argue both cases before the ITC.[10]

Nevertheless, the court recognizes that there may be some risk of manipulation given Commerce's interpretation of "imposed" because, in aligned cases, countervailing duties would never be "imposed" prior to the issuance of a final AD determination. As a result, a respondent like Polyplex would be included in an AD order despite the fact that countervailed subsidies, if accounted for in calculating that respondent's U.S. price, would obliterate the dumping. As the Department explained, however, the risk of manipulation by petitioners is slight given the uncertainty of an investigation's final results, coupled with the extremely unusual circumstance presented here, where a foreign producer's countervailed subsidies fully accounted for its less-than-fair-value sales, thereby reducing any AD cash deposits on its imported goods to zero.

---

[10] Commerce also pointed out that extension/alignment is not the only tool available to a petitioner who seeks to control the timing of AD and CVD orders. Rather than file AD and CVD petitions simultaneously, Petitioners might simply delay the filing of a CVD petition if they are concerned that countervailable subsidies, if accounted for in the AD determination, would exclude a foreign producer from an AD order.

Thus, this issue will not arise in the overwhelming majority of simultaneous AD/CVD investigations, even if they are aligned. It is, therefore, unlikely that Congress had any such situation in mind in enacting the AD laws, leaving Commerce free to devise a solution to this problem. Further, "even if the petitioners request an alignment, Commerce will continue to follow its established practice of reducing AD cash deposits for countervailing duties that it determined to impose to offset export subsidies."[11] Second Remand Determ. at 12. The court found in Dupont Teijin III that this practice, which prevents the actual assessment of double duties when subsidized and LTFV sales are related, keeps the U.S. in compliance with its WTO obligations, a goal presumably desired by Congress.[12] 297 F. Supp. 2d at 1370 n.5. Thus, the court finds that the Department's determination complied with the court's instructions to address the potential for unfair petitioner manipulation in companion AD/CVD investigations. As shown, the Department has provided a reasonable explanation for why the risk of manipulation should not impact its interpretation of 19 U.S.C. § 1677a(c)(1)(C) in concurrent investigations.

**B.      Whether the Second Remand Determination Explained How the Department Will Fairly and Consistently Apply Its Interpretation of "Imposed" When a Final or Amended Final AD Determination Issues on the Same Day as a CVD Order on the Same Merchandise**

As explained supra, Commerce's determination upon second remand explained that it likely will adjust respondents' U.S. prices when it simultaneously issues a final AD

---

[11] At this point, the zero cash deposit rate is only an estimate of duties. It automatically becomes the assessment rate, however, if no administrative review is requested. See 19 C.F.R. § 351.212(c)(1)(i) (2004).

[12] Furthermore, if countervailing duties continue to offset its AD margin, Polyplex may utilize proceedings which eventually will relieve it of AD discipline entirely. There is nothing which prevents inclusion of Polyplex within the regime of the order until it is determined whether AD margins will continue to be fully offset.

determination and a CVD order on the same merchandise. The Department explained, however,

that it is only permitted to amend its final determinations to correct for ministerial errors and,

accordingly, it is not appropriate to amend a final AD determination to account for a

subsequently-issued CVD order in calculating dumping margins. Thus, the Department

maintained that it correctly included Polyplex in the AD order on PET film from India. In its

appeal, Polyplex argues that Commerce is required to amend its final AD determination to adjust

Polyplex's U.S. price by the countervailing duties that were subsequently imposed in the CVD

order.[13] The court disagrees.

Commerce's inclusion of Polyplex in the AD order is consistent with the statute and the

court's rulings in this matter. The court held in Dupont Teijin I that Commerce may not exclude

_____

[13] Polyplex first quotes 19 U.S.C. § 1673, which authorizes the Department to impose antidumping duties "in an amount equal to the amount by which the normal value exceeds the export price (or constructed export price) for the merchandise." Next, Polyplex, points to § 1673e(a), which requires Commerce to publish an antidumping duty order within seven days of an ITC material injury determination that directs customs officials "to assess an antidumping duty equal to the amount by which the normal value of the merchandise exceeds the export price (or the constructed export price) of the merchandise." Polyplex emphasizes that these provisions require that the antidumping duties imposed in the AD order equal the amount by which the normal value of the merchandise exceeds its export price. Export price (or constructed export price), in turn, is governed by 19 U.S.C. § 1677a(c)(1)(C), which requires that the price be increased by "the amount of any countervailing duty imposed on the subject merchandise under part I of this subtitle to offset an export subsidy." Polyplex suggests that when these three provisions are read together, they "compel an upward adjustment to export price and constructed export price where, as here[,] countervailing duties have been 'imposed' (as interpreted by the Department) prior to the antidumping duty order." Polyplex Br. at 12.

     These provisions, however, do not mandate the result Polyplex suggests. Because countervailing duties are not "imposed" until a CVD order is published, and because the final AD determination on PET film from India was issued before the CVD order, the question here is whether the Department was required to amend its Final Determination in order to recalculate Polyplex's dumping margin in light of the subsequently-imposed countervailing duties. For the reasons discussed infra, Commerce was not required to issue an amended determination as to Polyplex.

Polyplex from the AD order on PET film from India on the basis of a zero cash deposit rate, when its dumping margin is greater than de minimis. 273 F. Supp. 2d at 1352. It is undisputed that, if Polyplex's export price is not adjusted for countervailable export subsidies, Polyplex's dumping margin is 10.34 percent. Id. at 1350. It is also undisputed that no adjustment can be made to a respondent's export price unless countervailing duties have been "imposed" under 19 U.S.C. § 1677a(c)(1)(C), and that, under Commerce's court-approved interpretation of the statute, countervailing duties are not "imposed" in an AD investigation until a countervailing duty order is issued. Dupont Teijin III, 297 F. Supp. 2d at 1373. Finally, it is undisputed that no CVD order had issued against Polyplex at the time that Commerce calculated Polyplex's dumping margin at 10.34 percent and published notice of its final determination in the AD investigation. Id. at 1374. Thus, it is clear that the Department's calculation of Polyplex's dumping margin was correct as reported in the final AD determination. The only question, then, is whether the Department was required to amend its Final Determination to account for the countervailing duties that were "imposed" on Polyplex's exports on the same day that the antidumping duty order issued. See id. (explaining that Commerce simultaneously amended the Final Determination to correct a ministerial error in another respondent's dumping margin, issued the antidumping duty order, and issued the countervailing duty order on PET film from India).

The court finds that such an amendment was not required here. It is a basic rule of administrative law that Commerce must base its determinations on information in the administrative record at the time the determination is made. See, e.g., Neuweg Fertigung v. United States, 16 CIT 724, 726–27, 797 F. Supp. 1020, 1022 (1992) ("Any information received by [the ITA] after the particular determination at issue is not part of the reviewable

administrative record."). Once a final determination is made, the statute only expressly permits

the Department to amend it to correct "ministerial errors" in the original final determination. 19

U.S.C. § 1671d(e). Such errors include "errors in addition, subtraction, or other arithmetic

function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other

type of unintentional error which the [Department] considers ministerial." Id. It is clear from the

language of this provision that it is meant to allow the Department to correct minor, non-

substantive errors in its final determinations. It does not authorize the Department to amend a

final determination in order to consider a subsequent event, such as the issuance of a CVD order

in a parallel proceeding, that would alter the original margin calculation.

These principles were explored in detail in Badger-Powhatan. In that case, the court

considered whether the Department was required to amend its final AD determination when the

products later found by the ITC to be causing material injury were significantly fewer in number

than those included in the ITA's dumping margin calculation and AD order. 10 CIT at 243, 633

F. Supp. at 1367. In addressing the issue of whether Commerce was required to amend its final

determination to recalculate the dumping margin, the court stated that "[i]t is now well

established that amendment, before or after remand, is appropriate when the agency has utilized a

legally improper method in making a determination or when the original determination contains

an error of inadvertence or mistake." Id. at 244, 633 F. Supp. at 1368; see Borlem, 13 CIT at

541, 546, 718 F. Supp. at 46, 49 (holding that, despite time limits and finality concerns, ITC has

authority to reconsider a final material injury determination upon remand where, due to an

amended LTFV determination, "the ITC made its finding of injury based upon material and

significant inaccurate facts"); see also SKF USA Inc. v. United States, 254 F.3d 1022, 1029 (Fed.

Cir. 2001) ("Remand to an agency is generally appropriate to correct simple errors, such as clerical errors, transcription errors, or erroneous calculations.").[14]

Badger-Powhatan and Borlem are readily distinguishable from the present case. In Badger-Powhatan, Commerce knew that the ITC had changed the scope of the final determination before it issued its AD order; it just failed to act upon that information. In Borlem, ITC acted upon erroneous information. Here, the AD order issued prior to the CVD order, so that no countervailing duties had been "imposed" on Polyplex's merchandise as of the final determination, and ITA was aware of all relevant facts. As a result, the Department's original determination correctly disregarded the countervailable export subsidies when calculating Polyplex's U.S. price. Thus, Commerce did not use a "legally improper method" in arriving at its determination, which would warrant an amendment. Similarly, as Commerce discusses in the Second Remand Determination, there was no other "error" in calculating Polyplex's dumping margin that would be remedied by looking to information already in the administrative record. As a result, Commerce determined that it was not permitted to amend its final AD determination under § 1671d(e). Polyplex seeks to impose upon Commerce the duty to amend its final determinations to take into account a dispositive event—the issuance of the CVD order—which occurred outside the administrative record in the AD proceedings. This is impermissible as a purely administrative act under controlling case law. Thus, the Department's Second Remand Determination reasonably concluded that it was not permitted to amend the final determination here, and that Polyplex must be included in the AD order.

---

[14] SKF, however, is distinguishable because the agency is not voluntarily requesting a court-ordered remand to correct an error or to implement changes in policy. See 254 F.3d at 1029–30.

**CONCLUSION**

For all of the foregoing reasons, the <u>Second Remand Determination</u> is sustained in its entirety. Commerce was not permitted to amend its final determination to account for a subsequently-imposed countervailing duty order on the subject merchandise. As a result, the Department properly determined to include Polyplex in the AD order on PET film from India. While addressing all of the court's concerns upon remand, Commerce correctly concluded that it was unable to exclude Polyplex from the order. Accordingly, the determination of the Department of Commerce upon second remand is sustained.


                                                    /s/ Jane A. Restani
                                                     Jane A. Restani
                                                      Chief Judge


DATED: New York, New York

      This 18th of June, 2004.